## THE TORNADO.

## ELLIS & Others *v.* ATLANTIC MUTUAL INSURANCE COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF LOUISIANA.

Decided April 30th, 1883.

*Affreightment—Contract—Freight—Total Loss.*

Where a vessel, before she breaks ground for a voyage, is so injured by fire that the cost of her repairs would exceed her value when repaired, and she is rendered unseaworthy and incapable of earning freight, a contract of affreightment for the carriage of cotton by her to a foreign port, evidenced by a bill of lading, containing the usual and customary exceptions, and providing for the payment of the freight money on the delivery of the cotton at that port, is thereby dissolved, so that the shipper is not liable for any part of the freight money, nor for any of the expenses paid by the vessel for compressing and stowing the cotton.

In admiralty. Libel for freight. The facts appear in the opinion of the court.

Mr. *Thomas J. Semmes* and Mr. *Richard De Gray* for the appellants cited *The Soblomsten,* L. R. 1 Adm. and Eccl. 293; *The Cito,* 7 L. R. Probate Div. 5; *Cargo ex Galam,* Br. & Lush. 167; *Aitchison* v. *Lohre,* 4 App. Cases, 755; *The Kathleen,* L. R. 4 A. & E. 269; *Jones* v. *Holm,* L. R. 2 Exchq. 335; *Tindall* v. *Taylor,* 4 Ellis & B. 219; 1 Parsons Maritime Law, 158–9; *Clark* v. *Insurance Company,* 2 Pick. 104; *Palmer* v. *Lorillard,* 16 Johns. 348; *Campbell* v. *Conner,* 70 N. Y. 424; *Bulkley* v. *Cotton Company,* 24 How. 386; *Jordan* v. *Warren Insurance Company,* 1 Story, 342; *Hubbell* v. *Great Western Insurance Company,* 74 N. Y. 246; *Shipton* v. *Thornton,* 9 Ad. & E. 314; *Hugg* v. *Banking Company,* 7 How. 595; *Hickie* v. *Rodocanachi,* 4 Hurls. & N. 455.

Mr. *P. Phillips,* Mr. *J. McConnell,* and Mr. *W. Hallett Phillips* for appellees.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

This is a libel in admiralty against cargo of the ship Tornado, brought by the master and owners of that vessel, to recover freight money. The district court, and, on appeal, the circuit court, dismissed the libel. The libellants have appealed to this court. The material facts found by the circuit court are these: On the 24th of February, 1878, the ship, while moored at the wharf in New Orleans, and bound on a voyage to Liverpool, England, and before she had broken ground for said voyage, was discovered to be on fire in her hold. Her master had given bills of lading for the transportation from New Orleans to Liverpool, with the exceptions usual in bills of lading, of 5,195 bales of cotton, of which 5,008 had been put on board, 164 were on the levee, and 23 had not reached the levee. Water was pumped into the ship to extinguish the fire, and, on the 26th, near six o'clock P. M., being filled with water, she sank to the bottom of the river alongside of the wharf, a part of her bulwarks remaining above water. While so resting upon the bottom of the river, the ship, cargo and freight were, on the 27th, libelled in the district court, for salvage, by the New Harbor Protection Company, and about two o'clock P. M. of that day the marshal, by virtue of a warrant of seizure issued by said court on said libel, took possession of the ship and cargo. On the 28th, about noon, the ship was pumped out and raised alongside the wharf, and the discharge of the cargo on board was commenced, all of it being damaged by water, and some of it by fire, 336 bales having been removed by the salvors in an undamaged condition before the ship sank but after the fire was discovered; but salvage was claimed and allowed on the entire cargo. On the same day, the proctor for the salvors filed in the district court a motion in writing, suggesting that the whole cargo then being discharged from the ship was greatly damaged by water and some of it by fire and water, and would in all probability have ultimately to be sold, being in an unfit condition to be sent to its destination, and an order of the court was thereupon made directing a sale of the cargo by the marshal upon the levee as it came out of the ship, on two days' advertisement, in such lots as might

accumulate from day to day. On the same day an application was made to the court by the master of the ship, in which he represented that he was desirous and entitled to bond the ship and cargo, and asked for a rule upon the libellant to show cause on the next day, March 1st, why the order to sell the cargo should not be rescinded, and the master be allowed to bond the cargo. On March 1st the rule came on for hearing. The proctor for the salvors, and counsel representing the insurers of the cargo, appeared and resisted the rescinding of the order of sale, and counsel appeared for the master, who filed a formal claim to the ship and cargo. On the trial of the rule witnesses were examined orally before the judge, among them various representatives of the underwriters on the cargo, who were called as witnesses by the proctor for the salvors, and who testified that if their interest were to be consulted they preferred that the cotton should be sold by the marshal as it came out of the ship, and that the master should not be permitted to bond the cotton. The counsel for the insurers of the cargo then asked leave to be heard on their behalf. To this the counsel for the master and claimant objected, and insisted that counsel for the underwriters on the cargo could not be heard until after the proof of abandonment to them by the owners of the cargo and acceptance of the abandonment. Thereupon Mr. Palfrey, president of the Factors' and Traders' Insurance Company of New Orleans, which was one of the companies represented by said counsel, and one of the witnesses who had been called to the stand as above stated, was recalled by said counsel and testified that so far as his company was concerned the loss on the cargo had been paid or ordered to be paid, and said company had become the owner of the cotton insured by it, and abandonment thereof had been made and accepted by his company. After this said counsel was allowed to and did make an oral argument in behalf of the underwriters, in opposition to the motion to rescind the order to sell which had been obtained by the salvors, but no pleadings were filed in behalf of the underwriters. Upon the trial of the rule evidence was also taken, by order of the court, in relation to the condition of the cargo, and whether the same was or was not a total loss. On

March 5th, and before the district court had made any decision or order on the rule to rescind the order for the sale of the cotton, a proctor representing underwriters at Lloyds, by leave of the court, filed an intervention for the interest of the insurers of the freight on the cargo, in which it was prayed that the order for the sale of the cargo be rescinded. This intervention was supported by affidavits filed by the intervenors and by a brief of the proctor. Afterwards, on March 6th, after consideration of the rule taken by the master of the ship to rescind the order of sale, and of the evidence and arguments thereon, and of the last named intervention, and of the affidavits and brief submitted therewith, the court ordered that the master be allowed to bond the ship and such of the cotton then stored in the levee steam cotton-press as was in good order, amounting to 523 bales, and that the remainder of the cargo on board the ship or upon the levee, which was more or less damaged, be sold by the marshal after three days' notice, and all questions of freight were reserved by the court, and the court appointed a trinity master to advise and assist in making sale of the cotton. On the 19th of March, the underwriters filed their claim, claiming all of the cargo, and procured an order from the judge of the district court to be entered on their claim, suspending the right given to the master, on the 6th of March, to bond such of the cotton as was stored in the levee cotton-press, to wit, about 500 bales, until the further order of the court. On March 26th, the master not having bonded the cotton, a rule was taken and duly served on him to show cause why the order of March 6th, so far as it allowed him to bond a portion of the cotton, should not be rescinded, and the movers of the rule, the insurers of the cargo, be allowed to bond the same. The rule was heard on March 27th, the movers of the rule and the master being represented by their respective counsel, and was by the court made absolute, without opposition, and the order allowing the master to bond said portion of the cargo was rescinded, and the movers of the rule were allowed to bond the same.

On the 30th of March, the present libel was filed. The unsold cargo and the proceeds of that which had been sold

were then in the custody of the marshal, in the suit for salvage. The libel recites the proceedings above mentioned, and alleges that the cotton might have been picked, dried and rebaled, and sent to its destination and freight have been earned thereon, but that the application of the master to bond the cargo was refused, owing to the opposition of the libellant for salvage, and especially to the opposition of the underwriters on the cargo; and that, under the contract of carriage, it was the right as well as the duty and the desire of the libellants to pick, dry and rebale so much of the cotton as might require it, and which could easily have been done, and to carry it to its destination and earn the freight money for carrying it, which they had been unable to do because they had been denied the right to bond it, owing to the opposition of the libellant for salvage and of the underwriters on the cargo, resulting in the taking away of the cargo entirely from the master, in consequence of which the entire freight money agreed on became due, as well as money paid by the libellants for compressing and stowing the cargo in the vessel, and other expenses incident thereto, and for railroad charges, for all of which the libel claims a lien on the cargo and on the proceeds of sale.

The circuit court found the following further facts: The libellants paid for compressing the cargo before it was put on board, and for stowing it on board, and other expenses incident thereto, $14,278.26. The gross freight on the cargo, had it been delivered at its destination in Liverpool, as required by the bills of lading, would have been £4,169 13s 1d. Of the cotton, 523 bales were in an undamaged and sound condition, being the 23, the 164 and the 336 before mentioned. In consequence of the fire, and as a result thereof, the ship was so badly damaged that the cost of her repairs would exceed her value when repaired, and she was unseaworthy and incapable of carrying freight. The 523 bales were bonded by the underwriters and were appraised at the sum of $19,100. The gross proceeds of the sale of the damaged cotton amounted to $116,000. The purchaser at the marshal's sale shipped to Northern States, in the condition in which it came from the ship, 1,185 bales of the damaged cotton; and 2,896 bales more

were picked, dried, rebaled and shipped, part to Liverpool and the rest to Philadelphia. All the damaged cotton taken from the ship was unmerchantable cotton, even after it had been picked, dried and rebaled, that is, it could not be used for making cotton cloth, but could only be used for making felt hats, paper, wadding and such like articles, having lost, by the submersion and drying, a large part of its natural oil, its fibre being injured and its weight reduced.

On the facts so found the circuit court held that the libellants had no lien on the cargo or its proceeds, for freight or for the money paid by them for compressing and stowing the cargo, and dismissed the libel.

The libellants seek to apply to the present case the principle applied where a voyage partly performed is interrupted by a disaster to the ship, namely, that the ship-owner has a lien on the cargo for the earning of the freight, and so has a right to carry the cargo forward by his vessel or some other conveyance, and deliver it and receive his full freight. As in the case of a disaster to the ship in the course of a voyage the whole freight is payable if, by the fault of the owner of the cargo, the master is prevented from forwarding the cargo from an intermediate port to its destination, it is contended in the present case that the libellants have a right to recover the whole agreed freight, because they had a right to send the cargo to Liverpool and earn full freight, and were prevented from doing so by the action of the underwriters, who became, by abandonment, the owners of the cargo. It is also contended that the owners had a right to repair the ship, even though the cost of repairing would exceed her value when repaired.

The law in regard to the respective rights and liabilities of shipper and ship-owner, where cargo has been carried for a part of a voyage, is nowhere better expressed than by Lord Ellenborough, in *Hunter* v. *Prinsep*, 10 East, 378, 394:

"The ship-owners undertake that they will carry the goods to the place of destination, unless prevented by the dangers of the seas, or other unavoidable casualties; and the freighter undertakes that if the goods be delivered at the place of their desti-

nation he will pay the stipulated freight ; but it was only in that
event, viz,, of their delivery at the place of destination, that he,
the freighter, engages to pay anything.  If the ship be disabled
from completing her voyage, the ship-owner may still entitle
himself to the whole freight, by forwarding the goods by some
other means to the place of destination ; but he has no right to
any freight if they be not so forwarded ; unless the forwarding
them be dispensed with, or unless there be some new bargain
upon this subject.  If the ship-owner will not forward them, the
freighter is entitled to them without paying anything.  One
party, therefore, if he forward them, or be prevented or dis-
charged from so doing, is entitled to his whole freight ; and the
other, if there be a refusal to forward them, is entitled to have
them without paying any freight at all.  The general property
in the goods is in the freighter ; the ship-owner has no right to
withhold the possession from him, unless he has either earned his
freight, or is going on to earn it.  If no freight be earned and
he decline proceeding to earn any, the freighter has a right to
the possession."

These remarks were made in regard to a voyage partly per-
formed, and interrupted by a disaster, where freight money
was claimed *pro rata itineris peracti.*  But no case can be
found in which freight money has been allowed, where the
voyage was not commenced, and the ship was, by a disaster
for which the shipper was not at all responsible, put into the
situation of the vessel in this case after the contract of carriage
was made.

In the present case the ship was rendered unseaworthy by
the fire and incapable of earning freight, and was so badly
damaged that the cost of her repairs would exceed her value
when repaired.  There is no suggestion in the findings that
there was any intention of repairing her, and on the facts
found it must be presumed she would not have been repaired.
All that could have been done, if the cargo had been bonded
by the master or ship-owners, in regard to sending it forward,
would have been to send it by another vessel.  But, although
the order of March 6th allowed the master to bond the 523

undamaged bales, and there was no suspension of that order until the 19th of March, they were not bonded.

We are of opinion that by the disaster which occurred before the ship had broken ground or commenced to earn freight, the circumstances with reference to which the contract of affreight-ment was entered into were so altered by the supervening of occurrences which it cannot be intended were within the contemplation of the parties in entering into the contract, that the shipper and the underwriters were absolved from all liability under the contract of affreightment. The contract had reference to a particular ship, to be in existence as a seaworthy vessel and capable of carrying cargo and earning freight and of entering on the voyage. All the fundamental conditions forming part of the contract of the ship-owner were wanting at the time when the earning of freight could commence. In addition, as the result of the fire, and by no fault of the shipper, all but 523 bales of the cotton was rendered unmerchantable, and put into such a condition that its owner might well hesitate to incur the expense of sending it to Liverpool. As to the undamaged cotton, the master had an opportunity for thirteen days to bond it, and failed to do so.

The money paid by the ship-owners for compressing and stowing the cotton, and for other expenses incident thereto, must be understood as having been included in the freight money, and to be reimbursed out of that, and to be money for which, in any event, the shipper of the cotton would not have been liable in addition to the freight money. If the ship-owner was not entitled to the latter, he was not entitled to anything. He took, as to the expenses, the risk of losing them if he lost the freight money. So, the two are bound up together.

It is an inherent element in a contract of affreightment under a bill of lading, that the vessel shall enter on the voyage named, and begin the carriage of goods shipped, or, as it is technically called, break ground, before a claim to freight money can arise, unless the shipper of the goods, the vessel remaining ready to enter on the voyage, undertakes to reclaim the goods. In the latter case, the circumstances under which the contract was entered into continuing substantially the same so far as respects

the vessel, the shipper cannot reclaim the goods without paying at least full freight. But, subject to this qualification, it is a principle of the maritime law, that if a ship does not begin her voyage at all, does not break ground, no freight can be payable. This was laid down and applied in the early case of *Curling* v. *Long*, 1 Bos. & Pul. 634. That case has never been overruled and no case holding to the contrary is cited or has been found. It is a case directly in point in two particulars, and it will be useful, therefore, briefly to examine it. Some hogsheads of sugar were shipped, under bills of lading, on a vessel while lying in a port in Jamaica, bound for London. Before the vessel sailed she was cut out by privateers and carried to sea, but was recaptured and taken into another port. Under a libel for salvage in the Admiralty Court of Jamaica the cargo was sold by order of the court, and the net proceeds were remitted to the defendants for the owners of the cargo. The ship-owners had expended money in lading the cargo, according to the usage of the Jamaica trade. They sued the defendants to recover the freight money or the expenses. It was held that they could not recover anything; that the inception of freight was breaking ground; and that the expenses incurred were to be reimbursed in the freight money or not at all.

The case of *Jones* v. *Holm*, L. R. 2 Exch. 335, was a different case. By a charter-party, a vessel was to go to a specified port and take a specified cargo and deliver it at Liverpool for a specified freight. She went to the port and was partly laden, when she was so damaged by fire that she was scuttled. The cargo was injured and sold, except a small part, not on board, which was forwarded to Liverpool by the master. The vessel was repaired and tendered to take the remainder of the cargo. The charterer refused to supply more cargo, and the vessel obtained a cargo and carried it to England at a less freight than she would have earned for a full freight under the charter-party. In a suit to recover damages for a breach of the charter-party, it was held the charterer was bound to complete the lading of the vessel.

The authority of the case of *Curling* v. *Long*, is recognized in *Bailey* v. *Damon*, 3 Gray, 94; *Burgess* v. *Gun*, 3 Harr. &

Johns. 225 ; *Clemson* v. *Davidson*, 5 Binn. 392 ; and in various text-books—3 Kent's Com. 223 ; 1 Parsons on Ship. & Adm. 220 ; Abbott on Shipping, 11th Lond. ed. 407 ; Maclachlan on Shipping, 2d ed. 458 ; Smith's Mercantile Law, 3d Am. ed. 400.

On principle, this case falls within the rule that where the stipulations of a contract are interdependent, a defendant cannot be sued for the non-performance of stipulations on his part which were dependent on conditions which the plaintiff has not performed. The ship-owner was entitled to freight only for carrying the cargo and delivering it at Liverpool, with the implied covenant that this particular vessel was to take it on board and enter on the voyage. Before that event occurred this vessel was substantially put out of existence by no fault of the shipper, and he had and could have no benefit from the contract. He had a right, therefore, to treat the contract as rescinded, so far as any liability for freight was concerned. In *Taylor* v. *Caldwell*, 3 Best & Smith, 826, it is laid down as a rule, that, " in contracts in which the performance depends on the continued existence of a given person or thing, a condition is implied, that the impossibility of performance arising from the perishing of the person or thing shall excuse the performance." The reason given for the rule is, that without " any express stipulation that the destruction of the person or thing shall excuse the performance," " that excuse is by law implied, because, from the nature of the contract, it is apparent that the parties contracted on the basis of the continued existence of the particular person or chattel." The rule was there applied to excuse the owner of a music hall, which had been burned, from fulfilling a contract to let the use of it. The principle was extended farther in *Appleby* v. *Myers*, L. R. 2 C. P. 651. There the plaintiffs contracted to erect certain machinery on the defendant's premises at specific prices for particular portions, and to keep it in repair for two years, the price to be paid upon completion of the whole. After some portions of the work had been finished, and others were in the course of completion, the premises, with all the machinery and materials thereon, were destroyed by an accidental fire. It was held that both parties were excused from the further performance of the con-

tract, and that the plaintiffs were not entitled to sue in respect of those portions of the work which had been completed, whether the materials used had become the property of the defendant or not. See Benjamin on Sales, 3d Am. ed. § 570; *Wells* v. *Calnan*, 107 Mass. 514, and cases there cited.

These principles are so well established that it is only necessary to refer to one case in this court, *Jones* v. *United States,* 96 U. S. 24, which recognizes them, in which it is said:

"Where an act is to be performed by the plaintiff before the accruing of the defendant's liability under his contract, the plaintiff must prove either his performance of such condition precedent, or an offer to perform it which the defendant rejected, or his readiness to fulfil the condition until the defendant discharged him from so doing, or prevented the execution of the matter which the contract required him to perform. . . . A contract may be so framed that the promises upon one side may be dependent on the promises upon the other, so that no action can be maintained, founded on the written contract, without showing that the plaintiff has performed, or at least has been ready, if allowed by the other party, to perform his own stipulations, which are a condition precedent to his right of action."

*On a full consideration of the case, we are of opinion that the decree of the circuit court must be affirmed.*