EARN LINE S. S. CO. v. SUTHERLAND S. S. CO., Limited.

(District Court, S. D. New York. November 12, 1918.)

1. CONSTITUTIONAL LAW ⊜⟹72—ENCROACHMENT ON EXECUTIVE—ACTS OF FOREIGN SOVEREIGNTY—LEGALITY.

A domestic court cannot, without trenching on the prerogative of its own executive, hold invalid the act of a foreign sovereign; so the action of the British Admiralty in requisitioning a British steamer under charter must be deemed legal, in an action in the United States by the charterers against the owner.

2. SHIPPING ⊜⟹58(3)—CHARTER PARTY—REQUISITION OF VESSEL—EVIDENCE.

In an action for breach of a time charter party by the charterers against the owner of a British vessel, requisitioned by the British Admiralty, held, that the requisition was legal and in invitum.

3. SHIPPING ⊜⟹51—CHARTER PARTY—REQUISITION OF VESSEL.

The requisitioning by the British Admiralty of a British vessel, under time charter excepting restraints of princes, etc., held to excuse the owner, a British subject, for refusal in Cuba of cargo which the charterer had directed transported, etc.

4. SHIPPING ⊜⟹38—CHARTER PARTY—REQUISITION OF VESSEL.

Where a time charter of a British vessel contained the usual breakdown clause, and excepted the restraints of princes, etc., and the vessel was requisitioned by the British Admiralty at a rate lower than the going rate, and there appeared no likelihood the vessel would be released before expiration of the charter, held, that the owner was warranted in treating the charter at an end, and in refusing to receive further hire and allow the charterer to collect sums paid by the Admiralty.

In Admiralty. Libel by the Earn Line Steamship Company against the Sutherland Steamship Company, Limited. Libelant given leave to move to amend, and libel ordered dismissed, if no motion is made.

This case arises on a libel in personam in the admiralty by the charterers against the owners of the steamship Claveresk for breach of a time charter party entered into in New York on February 8, 1913, under which the Claveresk was let for "about five years from the time of delivery" within the following limits: United States, West Indies, Central America, Caribbean Sea, Gulf of Mexico, South America not south of Bahia Blanca, Europe, and Africa not east of Port Said. Delivery and redelivery were to be made United Kingdom or continent between Bordeaux and Hamburg, and the hire was £1,320 per month. Clause No. 17 read as follows: "Should the vessel be lost, freight paid in advance and not earned (reckoning from the date of her loss) shall be returned to the charterers. The act of God, enemies, fire, restraint of princes, rulers, and people, and all dangers and accidents of the seas, rivers, machinery, boilers, and steam navigation, and errors of navigation throughout this charter party always mutually excepted." The ship was not to carry "molasses or wet sugar," and there was the usual "breakdown" clause.

The Claveresk entered upon the charter on April 17, 1913, and was used in carrying coal south and ore north between Cuba and the United States

under a subcontract between the libelant and an iron company. On January 26, 1917, when the charter had a little over a year to run, the owners, who were situated at Newcastle-on-Tyne, in England, received a telegram as follows: "Your steamer Claveresk required for government service after completion discharge in West Indies. Formal requisition follows. Please inform date steamer expected available for government service. Transports L Room 108a." This telegram was sent by a subordinate in the office of the Director of Transports, itself a department of the Lords Commissioners of the Admiralty, to which the respondents answered on the same day by telegram as follows: "Telegram received requisitioning Claveresk. This steamer arrived Baltimore January seventeenth expect would discharge ore load coals and sail again about twenty-third. Therefore expect now on passage to Felton, Cuba, where due about thirtieth. Ought to be discharged there one day and ready your service end this month. Can you arrange for government agent in Cuba give captain orders? You will doubtless remember when you requisitioned Claveresk in May, 1915, time charterers intercepted our telegrams and prevented captain receiving orders until ship loaded when you released her."

On January 27th one Cyril Hurcomb, for the Director of Transports, sent a letter to the respondents in confirmation of the Director's telegram. This letter inclosed a requisitioning letter and two copies of a pro forma charter party to be executed by the Lords Commissioners of the Admiralty. It stated that it was not proposed at the time to enter into a formal charter, but that hire would be paid in accordance with the agreement attached. It further stated that the ship would be required to load a full cargo of sugar and that the master should apply to A. H. Lamburn Company, Havana, for instructions. The requisitioning letter, which was inclosed, stated that it had been found necessary by the Lords Commissioners of the Admiralty to requisition the steamer under royal proclamation and under the conditions of the pro forma charter party inclosed. It further stated that the rates of hire as fixed for requisitioned ships had been generally accepted by shipowners, and that payments on this basis would be made as soon as possible.

On January 29th respondents wired their captain as follows: "Steamer requisitioned national service by British government apply to Lemborn [sic?] Havana for orders. Telegraph us acknowledging this message. Refuse load iron ore." The master answered on February 1st: "Instructions received. Wiring Laborn [sic?] Havana." On February 2d, Culliford & Clark, shipping agents, wrote the respondents that they had received the following cable from New York: "Notify owners that hire has been paid. If steamer definitely requisitioned, collect hire from admiralty account Earn Line." To which the respondent answered on the same day that, owing to the action of the government, they had been "frustrated" in completing the time charter and that no hire would be received thereafter on their account. This information was conveyed to the libelant in New York by the respondent's agent on February 17, 1917, at the time of refusing a half month's hire. The steamer was discharged at Felton, Cuba, on February 10, 1917, and has since that time been under requisition by the British Admiralty.

On August 3, 1914, the King of Great Britain issued a proclamation authorizing the Lords Commissioners of the Admiralty to requisition any British ship or vessel within the British Isles or the water adjacent thereto. On November 10, 1915, he issued a second proclamation that any British ship registered in the United Kingdom might be requisitioned for the carriage of food stuffs, and that such requisition should take effect on notice thereof served as therein provided. The notice was to be deemed sufficient and effective if addressed to the corporation owner in proper cases, and might be signed by any person authorized for such purpose by the president of the Board of Trade. On March 16, 1916, Parliament passed an amendment to the Defense of the Realm Act declaring that, when the fulfillment by any person of a contract is interfered with by the necessity of such person's complying with any requirement of the Admiralty, such necessity should be a good defense, and no action should be taken against such person for nonfulfillment of his

contract. An analogous amendment was also passed on July 10, 1917, the details of which it is not necessary to set out.

The testimony was taken in London by deposition of Sir Henry Erle Richards, for the libelant, and Charles Robertson Dunlop, Esq., for the respondent, upon the validity of this proclamation and of the requisition made in accordance with it. Mr. Dunlop was of opinion that the prerogative of the Crown authorized it to seize British property anywhere for the defense of the realm, and that this prerogative was limited in no sense by the terms of any proclamation which the King might utter. Sir Henry Erle Richards was of opinion that the prerogative extended only to the seizure of such property within the realm as was necessary for its defense, and that, regardless of the terms of the proclamation itself, the King could not under his prerogative seize property outside the realm. He also thought that the prerogative extended only to the actual seizure of property, and did not include a notice operating in personam upon the individual.

Mr. Dunlop was also of opinion that, the notice of requisition being legal, the owners were bound to obey it, and if they disobeyed would be liable to punishment by fine and imprisonment as for a misdemeanor, without specific statutory authority; also that the Crown could compel the owners to obey by a writ of mandamus issuing from the King's Bench Division of the High Court. He believed that the right itself could also be enforced directly by the Crown's seizing the ship on the high seas, or indirectly in a foreign port if the British representatives at such port had power to refuse clearance papers to the master. On these questions Sir Henry Erle Richards expressed no opinion.

Upon the trial of the cause Mr. Frederic R. Coudert and Lieut. Col. Howard Thayer Kingsbury prayed leave to intervene as amici curiæ, on the ground that they had been retained by the British Embassy at Washington to suggest upon the record that the Claveresk had been requisitioned by the government of Great Britain for government service upon the prerogative of the British Crown, on January 27, 1917, at which time the steamer was at sea; that the period of requisition was indefinite, and became operative on February 10, 1917, that she had remained continuously thereafter in the service of the British government under the orders of the Lords Commissioners of the Admiralty, and that such requisition was a governmental act of the government of Great Britain. This suggestion was evidenced by a certificate under the Embassy's seal, signed by Colville Barclay, British Chargé d'Affaires, in the absence of the British Ambassador. The suggestion was entered upon the record and the certificate received in evidence over the objection of the libelant.

Two points were raised: First, whether the requisition of January 27th was a valid excuse within the "restraints of princes" clause, and whether it justified the respondent in finally withdrawing the Claveresk from her charter on February 17, 1917; and, second, in case this point went against the libelant, whether in this proceeding it might have a decree for the difference between the hire received from the admiralty for the duration of the charter and the charter hire under the charter party.

Upon the second point the respondent raised the question of pleading and of jurisdiction. The libel was drawn for a breach of the charter party by repudiation, and contained no allegations concerning hire received by the owners from the Admiralty. The respondent asserted that under the pleading there could be no such award, and that in any event the action was at most for money had and received which was not properly cognizable in a court of admiralty. To meet this objection the libelant, upon the hearing, was allowed to file a replication setting up as new allegations that hire was due under the pro forma charter party between the Admiralty and the owners, and that the hire was greater than the hire reserved in the charter.

Charles S. Haight and Wharton Poor, both of New York City, for libelant.

J. Parker Kirlin and John M. Woolsey, both of New York City, for respondent.

Frederic R. Coudert and Lieut. Col. Howard Thayer Kingsbury, both of New York City, amici curiæ.

LEARNED HAND, District Judge (after stating the facts as above). [1] The first question in this case is whether the respondents are guilty of a breach of the charter party for refusing to carry ore on February 10, 1917, at Felton, Cuba, a few days before this libel was filed. That question I quite distinguish from their right to repudiate the charter party altogether on February 17, 1917, a point I am reserving for the moment. The libelants object, first, that the action of the British Admiralty was not authorized by the prerogative of the Crown, and could not be an excuse, at least until followed by some threat of compulsion. The act of another sovereign within its own territory is of necessity legal. Underhill v. Hernandez, 168 U. S. 250, 18 Sup. Ct. 83, 42 L. Ed. 456; American Banana Co. v. United Fruit Co., 213 U. S. 347, 29 Sup. Ct. 511, 53 L. Ed. 826, 16 Ann. Cas. 1047; Oetjen v. Central Leather Co., 246 U. S. 297, 38 Sup. Ct. 309, 62 L. Ed. 726; Ricaud v. American Metal Co., 246 U. S. 304, 38 Sup. Ct. 312, 62 L. Ed. 733; Hewitt v. Speyer, 250 Fed. 367, —— C. C. A. ——. It is quite true that the act of any public official of a foreign state may in fact be illegal by the municipal law of that state, but no domestic court may admit such a possibility without trenching upon the prerogative of its own executive. The presupposition upon which states must deal with each other is that each is responsible for, and so bound by, the acts of its own functionaries. The Invincible, Fed. Cas. No. 7,054. A court may not, therefore, make any assumption contrary to the fundamental presupposition upon which its executive will act. Hence I should not entertain this issue, whether or no the Embassy's certificate were in evidence.

The libelants urge that in Brunner v. Webster, 5 Com. Cas. 167, the court went into the question of the authority of a foreign official under his own law; but I cannot agree. In that case, while the ship was at Beyrut, the owners inquired of a Roumanian official, one Dr. Obregea, whether a cargo of rice might be discharged at Galatz, a place at which he had jurisdiction. Dr. Obregea answered that he should prevent the discharge, and the owners treated it as a restraint of princes. Kennedy, J., held that in his judgment Dr. Obregea's opinion would have been found erroneous, had the ship proceeded, and held that there was no restraint. The point is a narrow one, but it is still quite true that the official had not undertaken to stop the discharge; he had only indicated his purpose to do so, and Kennedy, J., was not undertaking to pass upon the validity of an official act, but to express his doubts as to what would in the sequel have been the definitive action of the Roumanian government, had the owners proceeded to Galatz.

[2] Nor am I impressed with the suggestion that the formal requisition followed the original telegram only because of the respondents' complaisance in its telegraphic answer. It appears to me somewhat naïve to suppose, under such circumstances as then existed, that the British Admiralty made requisitions dependent upon the consent of the shipowner. That the respondents were eager enough to have their

ship taken is clear enough, as well as is their desire to get rid of a charter then become onerous, and to substitute the Admiralty hire; but that this attitude had any effect upon the result seems to me a thin supposition.

[3] I must therefore assume that the requisition was legal and that it was in invitum. Did it excuse the owner? I think it did. I distinguish between the legality of the requisition which was sent and received in Great Britain and of the respondents' refusal to load in Cuba. The breach was committed in the territory of another state, and its legality was dependent wholly on the law of the place where it occurred, of, if one will, upon the law of New York, where the charter party was made, I do not care which. It was a wrong, not by virtue of British, but of Cuban, law, and no supposed law of the flag has anything whatever to do with it, in my judgment. No command of a foreign sovereign to its subject can legalize a wrong committed elsewhere. The refusal was excused only in case the owner was within the terms of the exception. Mr. Haight says that no coercion was exercised, or even threatened, which is quite true; but I think it is not enough. The ship might have been seized on the high seas by British cruisers—the only testimony is that it would—or it might have been detained by the British consul at Felton. That possibility was alone thought enough in The Athanasios, 228 Fed. 558.

But I do not rely upon restraints directed against the ship itself, for the case was between sovereign and subject, not between the owner and a foreign power. In the former case, at least now in England, a legal command of the sovereign is enough, though it operates only in personam. Brit. & Foreign Mar. Ins. Co. v. Sanday, [1916] 1 A. C. 650; Furness Withy & Co. v. Rederiaktiegelabet Banco, [1817] 2 K. B. 373. There is no case in the United States, so far as I know; but I accept the rule there laid down. It appears to me quite unreasonable to suppose that the parties should have supposed the owner to be released when his ship was restrained by a foreign power, but not when he was himself within the sanctions possible to his own sovereign. Nor do I think it necessary to show to what sanctions he would have in fact been subject. Force is implied in the very nature of law, and the requisition was a command having the force of law. The restraint was in existence, unlike that in Watts, Watts & Co. v. Mitsui, [1917] A. C. 227. It was the "direct" cause of the breach, unlike Becker, Gray & Co. v. London Assur. Co., [1918] A. C. 101. If the actual incidence of power was still somewhat contingent, that is no objection in this country, if reasonable prudence justified compliance, and not defiance. The Styria, 186 U. S. 1, 22 Sup. Ct. 731, 46 L. Ed. 1027; The Kronprinzessin Cecilie, 244 U. S. 12, 37 Sup. Ct. 490, 61 L. Ed. 960. I cannot agree that the owners were called upon to undertake the risks of disobeying a valid command of their sovereign, in order to see whether the command would be pressed with penalties. This was the assumption throughout in Tamplin, etc., Co. v. Anglo-Mexican, etc., Co., [1916] 2 A. C. 227.

So it follows, as I view it, that the refusal to load at Felton was excused, and if the case rested there nothing more need be said; but

it does not. While the respondents might safely have continued to refuse all orders while the ship remained on requisition, they would have been obliged to receive the hire and allow the libelants to collect the Admiralty hire; but this they did not do. On the contrary, they repudiated the charter party altogether and that was quite another thing.

[4] This repudiation the respondents justify upon the ground that the adventure has been "frustrated," in the language of the English cases. Whether one looks at it in that way, or as a question arising under the "restraint of princes" clause, makes in my judgment no difference. Certainly under the clause the owner was excused from observing the charterer's orders, because he could not; but if the charterer gave no orders of his own, and was content to adopt the directions of the Admiralty, how did the clause operate to relieve the owner from going on until the ship was used for purposes not covered by the charter party? This had as yet not happened; a voyage from Cuba to England was within the charter limits, and the cargo was not, so far as appears, either "molasses or wet sugar," which were excluded. While the charterer paid the hire, and the ship was not used for such other purposes, I can see no excuse under the clause for refusing to allow the charterer to adopt the Admiralty orders. Nor is there any difference, if one regards the question upon the basis of "frustration." The owner's adventure remained what it had been.

Now, the case is different with the charterer, whose rights must be considered, I believe, although the reason is not at once apparent. The requisition did not, of course, prevent his continued payment of the hire, or his performance of any of the other covenants in the charter party, not even the payment for coals, port charges, and dunnage, if demanded. Yet the restraint of princes clause the parties inserted as a mutual exception. As such it must be given some effect, if it can, and I can think of nothing so natural as to say that it excused the covenant to pay hire when the charterer could not have stipulated use of the ship. I recognize the force of Lord Parker's judgment in Tamplin, etc., Co. v. Anglo-Mexican, etc., Co., [1916] 2 A. C. 397, based upon the "breakdown" clause; but, as I view this charter, we have not the case of implying a condition which the parties have not expressed, but of giving effect to all the language which they used. The purpose evidenced by that clause is to put the vessel off hire when the charterer has no use of her. It is altogether consonant with that purpose to interpret the restraint of princes clause as effecting the same result, and the embarrassment felt by Lord Parker appears to me largely overcome when the parties have provided express language which must be taken as supplementary to the conditions specified in the "breakdown" clause.

However, as I have already implied, that excuse depends upon the failure of the consideration of the covenant to pay hire, not upon the impossibility of performance of the covenant, and when the ship is requisitioned on full hire there appears to me to be no failure at all. It is true that the charterer loses the use of the ship, but by hypothesis he gets the full equivalent in money. Presumably he could fix other

equal tonnage with the substituted hire, but it makes no difference whether he can or not. The venture is commercial, and may be settled in money. The changed situation is changed only in form; the charterer has the risk, and the advantage of any variation in the rates, and the owner his original assurance of the stipulated hire, which is precisely what each party agreed to accept. Moreover, if the charterer alone be allowed to disaffirm, he will do so only when the rates have fallen, and not if they rise. Such a right is obviously unfair, and could not have been the purpose of the parties. It deprives the owner of the security of a fixed hire, and relieves the charterer of the risk of a fall in rates. If, therefore, the charterer have such a right, so must the owner, which means that the contract is at an end, though, if continued, it would for the balance of the term leave the parties in substance in exactly that position which they accepted at the outset. Hence, if the Admiralty hire in the case at bar be fixed at the market rates for tonnage, I think that the charterer had no right to disaffirm upon requisition, and the owner no reciprocal right. That question the record does not answer.

If, on the other hand, the requisition be not at going rates, but at a substantially lower amount, as was, indeed, conceded arguendo, the situation appears to me quite different. I think it should fall as much within the clause as though the ship had been made a prize. Now it is quite true, and the case at bar is an instance of it, that notwithstanding that fact the actual Admiralty hire may be greater than the charter hire. The proper time at which to look is not, however, after the event, and when the rates have changed. The chief purpose of the charter, as I have said, is to impose upon one the risk of change, and to secure the other against it. But if the parties had been faced with the possibility that during the term the ship would have been seized at a large discount from the then going hire, obviously, if both were fair, they would have treated it as like a seizure without hire at all. The charterer's right and risk in the variation in rates would be "loaded," in the language of an actuary, with a heavy discount. He would not, if I may use the phrase, be getting a fair run for his money. Such an event the clause seems to me to cover as much as the capture of the ship or the like. And if the charterer have such a right, then so must the owner in similar case, and for the same reasons as when the requisition is at full rates. He may not be deprived of his assurance of a fixed hire when the venture turns out to be a loss, and deprived of the gain when it results in a profit.

There is, it is true, some artificiality in speaking of the right of the charterer to repudiate as a protection when the charter party was made before the war; but I suppose we must agree that the rule should apply generally both to charters made before the war and after it had affected rates. We necessarily look at the putative situation presented to the parties when the contract is made somewhat abstractly, not in the full concreteness of what afterwards occurred. If we did not, there could never be a bargain at all. Therefore, as I view it, if the requisition be permanent, the right of either party to disaffirm turns upon the Admiralty rate.

The English cases, and they are the only ones which deal with the question, do not, I must own, consider the matter quite in this way, though the result is the same as that which I have reached. The question always is of an implied condition which the parties have not expressed, an approach not really different in practice, though it is somewhat different in theory, at least if the exception be mutual. The absence of any consideration of the amount of the Admiralty hire I apprehend is due to the fact that the hire is never in fact a full equivalent. It would, indeed, be hardly excusable to consider the question so generally as I have, were it not that the difference in judicial opinion in England had left the law not wholly settled in theory. The rule is nevertheless quite the same as that which, as it seems to me, theoretical considerations would suggest.

The cases all take their origin from Tamplin, etc., Co. v. Anglo-Mexican, etc., Co., [1916] 2 A. C. 397, in which the owner had repudiated the charter party upon requisition of the ship. In both the courts below he had been unsuccessful, upon the ground that his concern was only with his hire, and that he could not complain if the charterer chose to accept the changed status, so long as he paid regularly. In the House of Lords the decision was affirmed by a vote of three to two, but for quite different reasons. Lord Parker of Waddington thought that the whole doctrine of an implied condition contradicted the express provisions of the charter party, and that the requisition did not affect the charterer's obligations or his rights to the Admiralty hire. Lord Haldane and Lord Atkinson thought that any requisition interrupted so vitally the basis on which the parties had contracted that the charter party was at an end. Lord Loreburn agreed with them in principle, but thought that the rule applied only when it was apparent that the requisition would outlast the charter party and that there was no such evidence. The case has been accepted as ruling, that, when the requisition to the mind of a reasonable man would seem likely to outlast the charter party, it terminated the contract, and that it applies as well to time as to voyage charters.

The charterer repudiated, and was sued by the owner, in Countess of Warwick S. S. Co. v. Le Nickel Soc. An., 34 T. L. R. 27, Admiral Shipping Co. v. Widner, Hopkins & Co., [1917] 1 K. B. 222, and Lloyd Royal Belge, etc., v. Stathatos, 33 T. L. R. 390 (as to the counterclaim); while the owner repudiated, and was sued by the charterer, in Chinese Eng. & Mining Co. v. Sale, [1917] 2 K. B. 599, and Heilgers v. Cambrian, etc., Co., 33 T. L. R. 348. Throughout, the only question discussed has been the probable duration of the requisition at the time when it was made; Tamplin, etc., Co. v. Anglo-Mexican, etc., Co., supra, being interpreted as leaving open only that issue.

There remains the question of the probable duration of the requisition. Even if the English rule be adopted, it appears to me that the probabilities were all strongly that the requisition would outlast the remainder of the term. I take it that the whole circumstances must be considered, and not merely the unexpired part of the term. If so, the evidence is strongly with the respondents. All the shipping men called were of opinion that there was small chance of any release at

the time, and the well-known facts bear them out. In February, 1917, Germany had already declared her unrestricted U-boat campaign and it was in force. The seriousness of the situation to Great Britain is a matter of such common knowledge that I may refer to it. The following months of that year were among the most critical of the war, and the crisis turned wholly upon the destruction of shipping. The avowed purpose was to prevent the victualing of the United Kingdom, and there was no reason to question the relentless determination with which it was announced. While the success of the project was, of course, uncertain, the large diminution of Britain's mercantile marine was to all intents a certainty, as well as the continued necessity of a national mobilization of all bottoms. Of course, no one could say how long the war would last; but the necessity of continuing that mobilization would not terminate with the war, for the shortage would in every probability be felt for long thereafter. The likelihood that a vessel then requisitioned should be released within 14 months appears to me, therefore, very slight.

If, on the other hand, the time at which the contract must be repudiated is at an interval after requisition, the result is the same. Every month after February, 1917, until April, 1918, only made the need of ships more pressing, and the event in fact justified the respondents' assumption.

I should myself incline to think that any requisition ought prima facie to terminate the charter party. As I have said, I do not regard the conditions of the "breakdown" clause as necessarily exclusive. It does not seem to me, with deference, a very practicable rule to speculate upon whether the charter party will outlast the requisition by any period at all. Suppose it does outlast it by a few months. The charterer may have been deprived of the use of the ship without adequate return for perhaps all but a short time. It seems unfair to hold him to the hire. I recognize the difficulties where the charter may have years to run; but when, as here, the question is of months, it seems to me that a requisition which is presumably intended for a substantial time should terminate the contract. This question it is not, however, necessary for me to decide.

Hence it follows that the libel should be dismissed, unless the libelants can show that the Admiralty hire was intended to be a full equivalent for the going rates. It is not necessary, therefore, to consider the questions of jurisdiction and of pleading which the case raises until it appears that they wish to raise that question. Within ten days after the filing of this opinion I will entertain a motion to amend the libel, alleging that fact; but, if none is made, the libel will be dismissed. The replication in no event appears to me valid.