302          PORTO RICO

Société Anonyme des Sucreries de Saint Jean v. Bull Insular Line.

# SOCIÉTÉ ANONYME DES SUCRERIES DE SAINT JEAN, Plff.,

*v.*

# BULL INSULAR LINE, INCORPORATED, Dft.

San Juan, Law, No. 1376.

### FRUSTRATION OF CONTRACT.

Contract—Commercial Law.

    1. A contract for the transportation of seaborne freight is not governed by the local but by the commercial law.

Contract—Civil Law.

    2. There is little difference between the civil law and the common law as to the principles of contract, except that the common law requires a consideration.

Contract—Interpretation.

    3. A court is limited to the interpretation of a contract. It cannot make a new one. Unless there is fraud, accident, or mistake, there is no dispensing power in a court.

Frustration of Voyage—Effect on Contract.

    4. Where on account of act of God or the like a voyage cannot be completed, the shipping contract is avoided, whether the frustrating occurrence is excepted or not.

Contract—Discharge of One Party.

    5. If, after the making of a contract for carriage of goods, the circumstances are such as to discharge one party to it, the other is also discharged.

NOTE.—Authorities discussing the question of act of God as excuse for nonperformance of contract, are collated in a note in L.R.A.1916F, 26.

On right of parties to contract, the performance of which is prevented by war conditions or acts of government in prosecution of war, see notes in 3 A.L.R. 21; 9 A.L.R. 1510; 11 A.L.R. 1429, and 15 A.L.R. 1512.

Société Anonyme des Sucreries de Saint Jean v. Bull Insular Line.

Wording—Exceptions.

    6. The mention of force majeure as an exception does not exclude the exception made by law of changes altering the fundamentals of a contract. When an event cannot be supposed to have been within the contemplation of the parties, they are not bound by general words which are not used in reference to the particular contingency.

Contracts—Principles.

    7. A contract is an agreement to do a certain thing, and implies capacity of parties, consent, definite object, and fundamental conditions unchangeable by the parties but subject to change by act of God and the like. Quære, whether the last corresponds to "causa" of the civil law. The German ruthless submarine warfare has made such a fundamental change of maritime conditions as to terminate a maritime contract.

Opinion filed September 1, 1920.

*Mr. H. G. Molina* for plaintiff.

*Mr. Charles Hartzell* for defendant.

HAMILTON, Judge, delivered the following opinion:

The complaint in this case was filed March 30, 1920, and alleges that the plaintiff sugar central contracted with the defendant navigation company on July 1, 1916, for the transportation by steamers from San Juan to New York of the output of the plaintiff for the crop years 1918–19–20–21–22, estimated at about one hundred thousand (100,000) bags per crop year, of 250 lbs. each, all at the freight rate of 24 cents per 100 lbs. The defendant refused to carry out this contract after October 15, 1917, alleging that the United States Shipping

Board had requisitioned all of defendant's steamers; but this disability terminated several months prior to the opening of the present 1919–20 crop season, and defendant nevertheless refused to accept and transport the sugar, plaintiff's sugar, at the agreed rate. As a result plaintiff alleges that it has been compelled to enter into a new contract at the rate of 40 cents, making a difference of $36,000, for which his suit is brought. The case comes up upon a demurrer filed March 6th, whose essential point is that the taking over of said vessels in connection with the world war terminated the contract, which thereafter was considered abrogated. There is no dispute as to the facts, and the question to be resolved is one of law.

1. The first point to be considered would be, by what law the contract is to be judged. It was made at Caguas in the Island of Porto Rico, and might therefore be considered to be under the Porto Rican law. If so, it would be governed by the Civil Code, and particularly §§ 1221 to 1281 inclusive. Perhaps the most pertinent sections would be the following:

"§ 1221. A contract exists from the moment one or more persons consent to bind himself or themselves, with regard to another or others, to give something or to render some service.

"§ 1222. The contracting parties may make the agreement and establish the clauses and conditions which they may deem advisable, provided they are not in contravention of law, morals, or public order.

"§ 1223. The validity and fulfilment of contracts cannot be left to the will of one of the contracting parties."

"§ 1225. Contracts are perfected by mere consent, and from that time they are binding, not only with regard to the fulfilment of what has been expressly stipulated, but also with re-

gard to all the consequences which, according to their character, are in accordance with good faith, use, and law."

"§ 1228. There is no contract unless the following requisites exist:

"1. The consent of the contracting parties.

"2. A definite object which may be the subject of the contract.

"3. The cause for the obligation which may be established.

"§ 1229. Consent is shown by the concurrence of the offer and the acceptance of the thing and the cause which are to constitute the contract.

"An acceptance made by letter does not bind the person making the offer, but from the time it came to his knowledge. The contract in such case is presumed as executed at the place where the offer was made."

"§ 1238. All things, even future ones, which are not out of the commerce of man, may be objects of contracts.

"Nevertheless, no contract may be executed with regard to future inheritances, except those the object of which is to make a division inter vivos of the estate, according to § 1023.

"All services not contrary to law or to good morals may also be the object of a contract.

"§ 1239. Things or services which are impossible cannot be the object of a contract."

"§ 1245. Contracts shall be binding, whatever may be the form in which they may have been executed, provided the essential conditions required for their validity exist."

"§ 1248. If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed."

"§ 1250. However general the terms of the contract may be,

XI. Porto Rico.—20.

there should not be understood as included therein things and cases different from those with regard to which the persons interested intended to contract." [Compilation 1911, §§ 4327–4329, 4331, 4334, 4335, 4344, 4345, 4351, 4354, 4356.]

It would seem, however, that the contract cannot be considered a Porto Rican contract because, so far as the defendant is concerned, it has not been enforced in Porto Rico. The essence of it was the transportation of certain freight from Porto Rico to New York on the high seas, and this, it is agreed, was not done. The violation, if any, related therefore to the high seas. In other words the contract was of a maritime nature, and not governed by local law. The United States have therein rules as to commercial law, which they enforce independently of any local regulations. Interstate commerce is a matter for the Federal government alone. Gibbons v. Ogden, 9 Wheat. 198, 6 L. ed. 70. In general jurisprudence of any sort local decisions do not control Federal courts. Boyce v. Tabb, 18 Wall. 546, 21 L. ed. 757; Venice v. Murdock, 92 U. S. 502, 23 L. ed. 585, and particularly is this true as to commercial law. Oates v. First Nat. Bank, 100 U. S. 239, 25 L. ed. 580. Matters relating to seaborne commerce are maritime and within Federal jurisdiction.

2. It is not perceived, however, that this principle would make any great difference in the case at bar. Lord Hardwicke modified the common law in regard to commercial matters by adoption to a large extent of civil law principles, and indeed the common law as to contracts is founded upon civil law itself. Both civil law and common law require the essentials mentioned in § 1228 of the Porto Rican Civil Code, which is itself the mere translation of the Spanish Civil Code. The Spanish Civil

Code is no mere transcription of the Code Napoleon, but both go back to Roman law principles and are very analogous. The Code Napoleon in § 1101 says: "A contract is an agreement which binds one or more persons towards another or several others to give, to do or not to do something." Section 1108 gives its elements as follows: "Four conditions are essential to the validity of an agreement: The consent of the party who binds himself; his capacity to contract; a certain object forming the matter of the contract; a lawful cause in the bond." This is practically the same as given in the Spanish Code, the only difference being that the Code Napoleon adds "capacity to contract," which itself is given in another section of the Spanish Code, being § 1230 of the Porto Rican Civil Code. The principal difference between the civil law and the common law is that the civil law does not require a consideration. This word is used more than once in the Porto Rican Code as a translation of the Spanish "causa," but it is a mistranslation. "Causa" is not consideration, but form or nature of contract, and merely indicates that the subject-matter of the contract must be one recognized by law. Certain contracts must be written, but no question connected with the form or with consideration arises in the case at bar. The question may be solved, therefore, upon the general principles of commercial law.

3. There is no doubt that the duty of a court in regard to a contract before it is limited to interpretation. It cannot make a new contract. It cannot even declare what the parties would have put into the contract if they had thought of it. If a contract is clear and its object is not illegal, it must be enforced, regardless of the question of wisdom of its terms. There may be some questions connected with mistake and accident which

equity could take into account, but the suit at bar is on the law side of the court, and does not seem to call for special application of the principles declared in the legislation of 1915, which enables the court to apply equitable principles in certain cases. Act of March 3, 1915, 38 Stat. at L. 956, chap. 90, Comp. Stat. § 1251a, 5 Fed. Stat. Anno. 2d ed. p. 1059.

The principle deducible from the authorities is that, if what is agreed to be done is possible and lawful, it must be done. Difficulty or improbability of accomplishing the undertaking will not avail the defendant. It must be shown that the thing cannot by any means be effected. Nothing short of this will excuse nonperformance. The answer to the objection of hardship in all such cases is that it might have been guarded against by a proper stipulation. It is the province of courts to enforce contracts—not to make or modify them. When there is neither fraud, accident, nor mistake, the exercise of dispensing power is not a judicial function. The Harriman, 9 Wall. 161–175, 19 L. ed. 629–634.

4. There are certain principles connected with the frustration of a voyage which it is sought to apply to the case at bar. When a supervening event is of such a character that it cannot reasonably be supposed to have been in the contemplation of the contracting parties when the contract was made, they will not be held bound by general words which, though large enough to include, were not used in reference to the possibility of the particular contingency which afterwards happens. It is on this principle that the act of God is in some cases said to excuse the breach of a contract. Baily v. DeCrespigny, L. R. 4 Q. B. 180, 38 L. J. Q. B. N. S. 98, 19 L. T. N. S. 681, 17 Week. Rep. 494, 15 Eng. Rul. Cas. 799. The principle upon which

this rests is not confined to maritime contracts. Thus, where a building was to be leased for a dance hall and it burned down, the contract was at an end, for the continued existence of the hall was necessary to any use of it. Taylor v. Caldwell, 3 Best & S. 826, 122 Eng. Reprint, 309, 32 L. J. Q. B. N. S. 164, 8 L. T. N. S. 356, 11 Week. Rep. 726, 6 Eng. Rul. Cas. 603. No court has an absolving power, but it can infer from the nature of the contract and the circumstances that an unexpressed condition was a foundation on which the parties contracted. Tamplin S. S. Co. v. Anglo-Mexican Petroleum Products Co. [1916] 2 A. C. 397, 85 L. J. K. B. N. S. 1389, 115 L. T. N. S. 315, 32 Times L. R. 677. In that case it was held that where a charter party was for five years and the ship was requisitioned by the government for a few months, the contract is not to be considered as ended. On the other hand, where a British ship was held in a German port the shipowner was not liable to pay wages to the crew because of the impossibility of the crew rendering services contracted for. Horlock v. Beal [1916] 1 A. C. 486–494, 85 L. J. K. B. N. S. 602, 114 L. T. N. S. 193, 32 Times L. R. 251, 60 Sol. Jo. 236, 21 Com. Cas. 201, Ann. Cas. 1916D, 670 (Lord Loreburn). So, where ships were loading at a Baltic port and were detained by the Russian authorities, it was held the adventure was frustrated and the hire contemplated by the charter could not be collected. The charter, in other words, was taken to have been entered into under the implied condition that, if supervening events not due to the default of either party render the performance of the "Baltic round" indefinitely impossible, the contract should be deemed dissolved. [Scottish Nav. Co. v. W. A. Souter & Co. [1917] 1 K. B. 222, 115 L. T. N. S. 812, 33 Times L. R. 71, 61 Sol.

Société Anonyme des Sucreries de Saint Jean v. Bull Insular Line.

Jo. 85, 22 Com. Cas. 154] (Lord Justice Eady.)   Similarly in the Anglo-Northern Trading Co. v. Emlyn [1917] 2 K. B. 78, a requisition for an undefined period frustrated the adventure and dissolved the contract.   So as to contracts on land to build a reservoir, when the government compelled work to cease and machinery to be sold to munition factories, the contract was held at an end because the interruption was so serious as to create a commercial impossibility for performance.   Metropolitan Water Bd. v. Dick K. & Co. [1918] A. C. p. 119; 8 B. R. C. 483, 87 L. J. K. B. N. S. 370, 117 L. T. N. S. 766, 82 J. P. 61, 34 Times L. R. 113, 62 Sol. Jo. 102, 23 Com. Cas. 148, 16 L. G. R. 1, Ann. Cas. 1918C, 390.

The matter received full  discussion also in the Supreme Court of the United States in the case of The Kronprinzessin Cecilie (North German Lloyd v. Guaranty Trust Co.) 244 U. S. 12, 61 L. ed. 960, 37 Sup. Ct. Rep. 490, where that German steamer carrying gold to Europe turned back in mid-ocean to America and was sued for nondelivery.   It would seem that there could possibly have been a safe delivery of the gold in England before war actually broke out, but the captain was by his government directed to return, and the Supreme Court (Justice Holmes) held him justified in so doing.   "The master is not to be put in the wrong by nice calculations that, if all went well, he might have delivered the gold and escaped capture by the margin of a few hours.   In our opinion the event shows that he acted as a prudent man."   Page 24.   It was there declared that the seeming absolute confinement to the words of an express contract indicated by the older cases like Paradine v. Jane, Aleyn, 26, 82 Eng. Reprint, 897, has been modified so far as to exclude from the risks of contract for conduct that

Société Anonyme des Sucreries de Saint Jean v. Bull Insular Line.

which it cannot be believed the parties would have embraced in the contract. In other words, although the risk in that case was not within the exception of "arrest and restraint of princes, rulers, or people" expressed in the bill of lading, peril of belligerent capture affords an implied exception to the carrier's undertaking. The carrier is at liberty to anticipate war. The Kronprinzessin Cecilie, supra.

5. There is no question, however, that each contract must depend upon its own wording and circumstances. If an impediment is temporary the party is not excused, but a state of war must be presumed likely to continue long and so to affect the commerce of merchants as to defeat and destroy the object of a commercial adventure. Geipel v. Smith, L. R. 7 Q. B. 414, 41 L. J. Q. B. N. S. 153, 26 L. T. N. S. 361, 20 Week. Rep. 332, 1 Asp. Mar. L. Cas. 268. It is not necessary, therefore, to wait until the delay has occurred and a party may act at once. The question is what estimate would a reasonable man of business take of the probable length of a withdrawal of a vessel from service with such materials as are before him. This being done, it is immaterial whether his anticipation is justified or falsified by the result. Anglo-Northern Trading Co. v. Emlyn, supra, p. 85. The bill in this case does not show whether the defendant notified the plaintiff that the contract was at an end or not when its ships were requisitioned. It is quite likely that under the grave conditions presented, this was not done, and that it was not deemed necessary to do it. However, if lack of this notice be an element in the case, the presumption must be against the plaintiff, for he does not state it in his pleadings. The demurrer admits facts which are well pleaded, but does not admit that there may not be other facts in the case. The

inference to be drawn from the bill is that the contract was made for five years and was interrupted indefinitely by the requisition of the Shipping Board.

The case at bar presents a new phase which has not been passed upon by any preceding case. There cannot be said to be a frustration of the contract in the sense that no sufficient time is left for part performance. Two fifths of the time still remained when the bill was filed, which is to be held to be a substantial part of the period contemplated. But other elements than time are involved.

The defendant could not be required to notify the plaintiff that it would be unable to perform the contract beyond the notice that was given that the Shipping Board had requisitioned the fleet. The plaintiff could judge as well as the defendant as to the probable length of such interruption. A determining factor in the case is the fact that the plaintiff was not bound to await the end of the requisition. If there had been, for instance, a neutral line carrying cargo at substantially the same rate originally contracted for, there is no reason why the plaintiff could not have made a new contract. The plaintiff was certainly released by the action of the Shipping Board to the extent that it could have made another contract if that had been to its advantage. In point of fact it did make another contract, and, so far as appears, without notifying the defendant that it would hold it accountable for any difference of rates. But if one party to a contract was released, the other must be also. There is such a thing as a unilateral contract, but a contract to carry freight for a certain rate is not one of this character. The fact that there may have been no such neutral possibility does not alter the case. The question is as to whether

the contract was dissolved or whether it was merely suspended. If it was dissolved in favor of one party, it must be held dissolved in favor of both parties.

6. It is contended, however, that whatever might be the abstract principle in the case, the parties are bound by the words of the contract, and if they limit their exceptions, neither side can complain afterwards. Thus in the contract at bar there is a provision that "if by reason of force majeurè either of the parties are unable to carry out this agreement in whole or in part, such inability by either party will not subject such party to any claims for damages, nor will such inability void this agreement."

The question is, What is the proper application of this clause under the circumstances of the case?

The best way to solve this question is to consider the circumstances under which the parties were contracting. The United States was not then at war with Germany, but the sinking of the Lusitania had occurred on July 12, 1916. There had been a threatening interchange of notes between the two governments, and the submarine menace made war possible at any time. What would happen in case of war as between the government and ships was already illustrated by the action of Great Britain, which had practically taken over all the shipping of the Empire. Force majeure which would make the parties unable to carry out the agreement in part would naturally be that coming from the sinking of one or more ships by a German submarine, even in time of peace; force majeure which would make the parties unable to carry out the agreement as a whole might be intensified by submarine danger but might also come from some act of the national government. None of these, it

Société Anonyme des Sucreries de Saint Jean v. Bull Insular Line.

was declared, would subject the steamship company to claims for damages. It was also declared that such inability would not void the agreement, but it would be a contradiction in terms to interpret this as meaning that if the government took over the shipping for an indefinite period the agreement would not be avoided. Parties can make a binding contract as to anything that is not impossible, but an agreement that the taking over of the ships by the government should not avoid a contract by which the shipping company undertook to transport freight would be such an impossibility that, if it does not fall within the prohibition of law, at least comes so near that it cannot be presumed the parties intended such a construction. It has been held that when, by a disaster which occurred before the ship had broken ground or commenced to earn freight, the circumstances with reference to which the contract of affreightment was entered into were so altered by the supervening occurrences, which it cannot be contended were within the contemplation of the parties in entering into the contract, that the shipper and the underwriters were absolved from all liability under the contract of affreightment. The Tornado (Ellis v. Atlantic Mut. Ins. Co.), 108 U. S. 342, 27 L. ed. 747, 2 Sup. Ct. Rep. 754. Where the event is of such a character that it cannot be reasonably supposed to have been in the contemplation of the contracting parties when the contract was made, they will not be held bound by general words, which, though large enough to include, were not used with reference to the possibility of the particular contingency which afterwards happens. Chicago, M. & St. P. R. Co. v. Hoyt, 149 U. S. 1, 15, 37 L. ed. 625, 630, 13 Sup. Ct. Rep. 799. When the event is of such a character it cannot reasonably be supposed to have

Société Anonyme des Sucreries de Saint Jean v. Bull Insular Line.

been in the contemplation of the contracting parties when the contract was made, they will not be held bound by general words which, though large enough to include, were not used in reference to, the possibility of the particular contingency which afterwards happens. Baily v. De Crespigny, L. R. 4 Q. B. 180, 38 L. J. Q. B. N. S. 98, 19 L. T. N. S. 681, 17 Week. Rep. 494, 15 Eng. Rul. Cas. 799, supra.

It would seem that this case comes within the principle. The contract must be regarded as terminated by the occurrence of something which was not within the contemplation of the parties at the time, and not embraced within the stipulation as to suspension. In confirmation of this it is a matter of judicial knowledge that all conditions, as to wages, labor, supplies, and expenses of every character, everything except the sea itself, are materially different from what they were before the two years' war intervention of the Shipping Board. Parties are bound by their contract notwithstanding a change of circumstances, for under any other rule it would be the court, and not the parties, which make the contract. But the contract, according to all authorities,—statutory and textbook,—may come to an end not only by the act of the parties themselves, but by a change of law or a destruction of one of the material elements of the contract.

Perhaps a restatement of the principles of contract may not be without value. A contract, we are told, is an agreement between two men to do a certain thing, and it implies therefore capacity of the parties, their consent, a definite thing to be done, and fundamental conditions which cannot be changed by the parties but may be changed by what is variously called force majeure, restraint of kings and princes, or act of God.

Société Anonyme des Sucreries de Saint Jean v. Bull Insular Line.

No question arises in the case except as to the last point. This may or may not correspond to the "causa" of the civil law, but is at all events a material element of the contract. If the party dies or becomes insane, or if nature or the government make a change in the fundamental conditions under which the contract was made, the contract must be held to come to an end. This by no means permits a party to change his mind, but it does recognize a fundamental change for which the party is not responsible. The rule has been perhaps best stated by Justice Holmes in the case of the Kronprinzessin Cecilie, and its principle would not only justify a sea captain in turning back when in all probability he could not deliver his cargo, but a transportation company in considering a contract at an end not only when the government takes possession of his fleet, but when the government returns it with all conditions of service fundamentally changed by an unprecedented war, which if it does not make a new heaven at least makes a new earth. The civil law justifies rescission where there is a change (lesion) in conditions of 20 per cent. Commercial law must recognize the termination of a contract where all conditions have changed 100 per cent through the act of God or the public enemy, whether that condition be one existing through stress of war in being, or results of a war immediately past. A German war leaves nothing in the condition it was previously. Particularly is this true after German submarine warfare. A little longer and there would have been no non-German ships, but the world's shipping at the time of the requisition was already ruthlessly depleted.

The taking over of the fleet by the Shipping Board for an indefinite period must be held to have ended the contract, en-

Société Anonyme des Sucreries de Saint Jean v. Bull Insular Line.

abling the plaintiff to make other arrangements as well as indefinitely disabling the defendant from carrying it out. The fact that the Shipping Board control has since ceased does not change the fact that the war which caused the Shipping Board's intervention has now caused an entire change in all the circumstances surrounding the parties. The effect upon this contract dated from the time of requisition itself. The Isle of Mull, 257 Fed. 808; Earn Line S. S. Co. v. Sutherland S. S. Co. 254 Fed. 133. The true test must be held to be not merely the time left of that named in the contract as mentioned in the Anglo-Northern Case, supra, .but whether under public conditions there was any contract left, any room left for the agreement which the parties once made. As was said in the Allanwilde Case, there could be no waiting until the impediment was removed, for the duration here even more than in the Allanwilde Case was of indefinite extent. It must be deemed continuing as long as the cause of its imposition, that is the submarine menace, and that as far as then could be inferred would be the duration of the war, of which there could be no estimate or reliable speculation. The condition was, therefore, so far permanent as naturally and justifiably to determine business judgment and action depending upon it. Allanwilde Transport Corp. v. Vacuum Oil Co. 248 U. S. 377–386, 63 L. ed. 312–317, 3 A.L.R. 15, 39 Sup. Ct. Rep. 147. The contract must be deemed to have been determined then and there. The court cannot make a contract for the parties, but it can and should declare when a contract has ceased to exist because of changed overpowering public surroundings.

It follows that the demurrer must be sustained, and it is so ordered.