MOORE & TIERNEY, Inc., v. ROXFORD KNITTING CO.

(District Court, N. D. N. Y.   July 1, 1918.)

1. WAR ☞4—PRECAUTIONARY ACTS—CONTRACTS—BREACH—DEFENSES.

Under National Defense Act, § 120 (Comp. St. 1916, §§ 3115f–3115h), and Navy Appropriation Act March 4, 1917, c. 180, it is the duty of a manufacturer, where the United States orders war supplies, to comply with the order, though that prevents him from carrying out earlier contracts with private persons; but where a manufacturer voluntarily enters into contracts with the United States, which prevent him from carrying out earlier contracts, he is not relieved from an action of damages for breach.

2. WAR ☞4—PRECAUTIONARY ACTS—EFFECT ON CONTRACTS—BREACH.

Where a manufacturer, after communication with a member of the Advisory Board of National Defense, and being informed that the orders were obligatory, contracted to supply underwear for the navy, held, that the order must be deemed to have been placed in accordance with National Defense Act, § 120 (Comp. St. 1916, §§ 3115f–3115h), and Navy Appropriation Act March 4, 1917, c. 180, making compliance obligatory; so the manufacturer was not liable for breach of contracts with private persons, which he was unable to carry out because of the navy contract.

3. WAR ☞4—PRECAUTIONARY ACTS—EFFECT ON CONTRACT RIGHTS.

As great publicity was given to National Defense Act, § 120 (Comp. St. 1916, §§ 3115f–3115h), and Navy Appropriation Act March 4, 1917, c. 180, which authorizes the government in time of war to place compulsory orders with manufacturers and for supplies, manufacturers and private persons with whom they contract must be presumed to have contracted with reference to such laws.

4. WAR ☞4—WAR-MAKING POWER—AUTHORITY OF CONGRESS.

In view of the paramount war-making power of Congress, National Defense Act, § 120 (Comp. St. 1916, §§ 3115f–3115h), and Navy Appropriation Act March 4, 1917, c. 180, authorizing the government to place compulsory orders with manufacturers for needed supplies, are valid.

5. WAR ☞4—"WAR MATERIAL"—"STORES AND SUPPLIES."

Within Navy Appropriation Act March 4, 1917, c. 180, allowing the government in time of war to place compulsory orders with manufacturers for war material, and defining "war material" as including arms, ammunition, armanent, stores, supplies, and equipment for ships, underwear for the crews of war vessels is part of the "stores and supplies."

At Law.   Action by Moore & Tierney, Incorporated, against the Roxford Knitting Company, which counterclaimed.   Judgment for plaintiff.

Action to recover $14,090.08, purchase price of knit goods sold and delivered.   Defendant counterclaims for alleged damages for nonperformance of balance of contract.   Plaintiff answers to the counterclaim that orders of the United States government, which it was required to fill under the acts of Congress (National Defense Act June 3, 1916, c. 134, 39 Stat. 166, and Naval Appropriation Act March 4, 1917, c. 180, 39 Stat. 1168), made compliance with its contract on time impossible, and that the law gave precedence to such government orders, and postponed compliance under the contract with defendant, and that, defendant having declared the contract ended, it can recover for goods not paid for actually delivered, and is not liable for damages.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Thos. O'Connor, of Waterford, N. Y., and John T. Norton, of Troy, N. Y., for plaintiff.

Gallert & Heilborn, of New York City, and D. F. Costello, of Syracuse, N. Y., for defendant.

RAY, District Judge. At the time war was declared between the United States of America and the Imperial Government of Germany the plaintiff, engaged in manufacturing knit underwear, had a valid contract or contracts with the defendant, by the terms of which it was obligated to make and deliver to defendant certain quantities of woolen knit undershirts and drawers at agreed prices and at or within specified times. These contracts came into existence by way of accepted orders, which were subject to delays or nondelivery by strikes, accidents, or for any reason beyond the control of plaintiff. It was then engaged in the performance of such contracts, and intended in good faith to perform, but was prevented by the performance of certain government orders. The plaintiff is one of several manufacturers of such goods located at Cohoes, N. Y. Deliveries aggregating $14,090.08 were made and not paid for, and considerable quantities were not delivered. Defendant alleges $20,000 damages for nonperformance or alleged breach of contract.

May 22, 1917, one A. Frey, who was a member of a committee of the Advisory Board of National Defense, wrote each of these manufacturers at Cohoes, N. Y., including the plaintiff, informing them that the United States government was in need of and desirous of obtaining knit undershirts and drawers, inquiring as to the capacity of the mills of the manufacturers and the quantities they could furnish, at what prices, and also saying:

"I would request you not to write me that you are sold up and cannot furnish any of these goods. I am aware that this condition prevails with every one. * * * It is not the committee's intention to place the whole burden on any one mill, but to divide it according to production, and I would therefore request you to give this your prompt attention and advise me promptly how much of this it will be your pleasure to take, and at what prices."

On receiving these communications, these manufacturers called a meeting at Cohoes, where the communications of Mr. Frey were considered and their nature discussed, and all agreed it was a requirement of the government of the United States, constituting an order, to which it was their duty under the acts of Congress hereafter mentioned to respond. Each manufacturer was left to figure out what amount it could furnish, and a committee was appointed to see and confer with Mr. Cromwell, chairman, etc., of the Advisory Board of National Defense, but who in fact was also acting for Mr. Hancock, Paymaster of the Navy, in charge of the purchase department, in obtaining and submitting information and making recommendations for navy supplies, etc. This committee did see him regarding the matter, and was advised by him that the requirement was obligatory.

The productive capacity of these mills was given, and later the committee recommended to the War Department the making of an

agreement or contract with the plaintiff for certain knit shirts and drawers of the kind and quality desired by it, and which plaintiff's mill could make. This order or contract of June 6, 1917, did not demand the full capacity of the plaintiff's mill, and if there had been no further orders from or contracts with the government the plaintiff could have and would have filled this government order or contract, and also its contract with the defendant. Preceding this June 6th order Mr. Cromwell, on letter heading reading as follows: "Knit Goods Committee of the Council of National Defense, 357 Fourth Ave., New York"—wrote as follows:

"New York, June 1, 1917.

"Messrs. Moore & Tierney, Cohoes, N. Y.—Gentlemen:—We are in receipt of your letter in relation to government underwear. A recommendation is going by this same mail to the Quartermaster's Department, at Philadelphia, that a contract should be issued to you for 36,000 shirts and 36,000 drawers, at $1.25 each, for delivery, freight and cartage paid to the New York depot, the goods to be made according to the specifications known as 'Alternate B,' on which your price was based. The committee is required to secure a very large quantity of this underwear. It is our wish to disturb the regular business of each manufacturer as little as possible, and therefore we will do our very best to secure the full amount of underwear needed without coming back to you for additional deliveries. Should the government requirements increase, we shall have to ask you for a larger part of your product between now and the end of the year.

"Yours truly,      Lincoln Cromwell, Chairman."

July 2, 1917, Mr. Cromwell, signing as chairman, etc., wrote the plaintiff and the other manufacturers of knit goods mentioned as to the urgent wants and needs of the United States Navy Department for knit undershirts and drawers, and amongst other things wrote:

"The Knit Goods Committee has received an emergency call for the Navy Department," etc.; and also, "It is absolutely necessary that this underwear should be obtained;" and also, "This underwear can be made by only a limited number of mills in the country. We have carefully apportioned it among the different mills, and know that we cannot secure the quantity needed unless we can receive from you 25,000 shirts and 25,000 drawers by October 1st and the same quantity additional by December 1st."

Mr. Cromwell was still acting for the Paymaster of the Navy, as stated. On the receipt of these letters another meeting of the manufacturers was held, and such letters were considered and construed as an order, within the meaning and intent of the acts of Congress referred to, and prices and quantities and deliveries were later agreed upon with the government agencies and formal written agreements were made. This order was for more than plaintiff could produce, and Cromwell was so notified, and July 20th Mr. Cromwell wrote they had telegraphed the Navy Department, suggesting that a certain quantity "shall be canceled from your order," and this was done. Nothing was said in the contracts or agreements or orders that these were orders placed under the acts of Congress, but it is established that the plaintiff so understood them and acted accordingly. The evidence of Paymaster Hancock plainly indicates that the Navy Department so understood them, and that the department placed orders in several ways, both before and after their adoption of a formal commandeering form of order the latter part of July, 1917.

[1] To fill this order or contract with the Navy Department, and also the orders or contracts with the War Department, demanded and required the total capacity and output of the plaintiff's mill while filling same, and plaintiff was unable, if it filled the government orders or contracts, to make further deliveries to defendant under its contract with it at the times agreed, and defendant was so advised, whereupon it in substance and effect canceled the contract, refused to pay for the goods delivered, and claimed and claims damages for nonperformance. Two other contracts or orders were placed with the plaintiff by the government, one November 16, and one December 12, 1917, and from the acts of the parties and the correspondence it cannot be doubted that it was understood the plaintiff in accepting the work, was acting under the orders and demands of the government. The plaintiff does not contend that these government requirements released it from the contract with defendant and obligation to perform it, except in so far as it postponed performance on its part and gave preference to this government work. The defendant claims these were not orders under or within the meaning of the acts of Congress referred to, and that it was justified in acting as it did, and may counterclaim its damages.

If before or after war was declared a party, A., entered into a contract with another party, B., to make and deliver to him goods, wares, and merchandise, stores and supplies, such as the government requires for army or navy use, or both, and after the passage of the acts of Congress—Public No. 85, 64th Congress, approved June 3, 1916, "An act for making further and more effectual provision for the national defense, and for other purposes," and Public No. 391, 64th Congress, approved March 4, 1917, "An act making appropriation for the naval service for the fiscal year ending June 30th, 1918, and other purposes" —the United States government, being at war, came in and ordered or directed such party, A., to make goods, wares, and merchandise of the nature and kind referred to for it, and compliance with such order and requirement of the government demanded or required the entire output of the factory of such party thereafter, all it could reasonably produce, it was the duty of such party to comply with such government order or requirement, and if compliance therewith made it impossible for such party to fill or comply with or perform its contract with such other party, B., according to its terms and within the time specified, and such other party, on being notified of the inability to so perform, declared the contract ended, he cannot recover damages for nonperformance by A. The same rule applies in case of a contract made after the enactment of such statutes; a state of war existing.

In such case or cases it is clear that, under the provision of the acts of Congress referred to, performance by A. within the time required by the contract was made impossible by the act and requirements of the United States government. But if party A., thinking it more profitable or patriotic to work for the government than in the performance of its existing contract with B., voluntarily sought a contract with the government and offered its services for compensation in the

manufacture of such goods as the government required, and voluntarily entered into such a contract sought by it with the United States, the performance of which demanded and required its entire output, all it reasonably could produce, and party A. thereupon voluntarily declined or refused to proceed further in the performance of his contract with party B., he is not excused, and party B. may recover or offset and counterclaim his damages, if any. In such case performance by A. is not prevented by act of God, or vis major. Nonperformance is the result of his voluntary act or acts, not that of the government, and he acts under no compulsion whatever.

But section 120 of the National Defense Act, referred to, authorizes the President, through the head of any department, in addition to the present authorized methods of purchase or procurement, the methods before in use, to "place an order" with any individual, firm, association, company, corporation, or organized manufacturing industry for such product or material as may be required, and which is of the nature or kind usually produced or capable of being produced by such individual, firm, or corporation, and then further provides that, when such an order is placed, "compliance with all such orders for products or material shall be obligatory," and "shall take precedence over all other orders and contracts theretofore placed with such individual, firm, or corporation." Refusal to comply is made a crime, and severe punishments may be inflicted, etc.

The compensation is to be fair and just, and it is assumed it may be agreed upon between the manufacturer and the United States in writing and by way of a contract. The Navy Appropriation Act provides:

"(b) That in time of war, or of national emergency arising prior to March first, nineteen hundred and eighteen, to be determined by the President by proclamation, the President is hereby authorized and empowered, in addition to all other existing provisions of law:

"First. Within the limits of the amounts appropriated therefor, to place an order with any person for such ships or war material as the necessities of the Government, to be determined by the President, may require and which are of the nature, kind, and quantity usually produced or capable of being produced by such person. Compliance with all such orders shall be obligatory on any person to whom such order is given, and such order shall take precedence over all other orders and contracts theretofore placed with such person. If any person owning, leasing, or operating any factory equipped for the building or production of ships or war material for the navy shall refuse or fail to give to the United States such preference in the execution of such an order, or shall refuse to build, supply, furnish, or manufacture the kind, quantity, or quality of ships or war material so ordered at such reasonable price as shall be determined by the President, the President may take immediate possession of any factory of such person, or of any part thereof without taking possession of the entire factory, and may use the same at such times and in such manner as he may consider necessary or expedient."

[2-4] In the instant case now before this court did the President—that is, the government—through any of his or its agencies "place an order" with the plaintiff for these undershirts and drawers which was obligatory, under the acts of Congress referred to, upon the plaintiff, and which it was required to fill; or could the plaintiff, at any time after the agreements were entered into, have refused to perform without violating the acts of Congress, saying, as to each, it is only a mere

voluntary contract, and it is optional with me to perform or not perform, as I must fulfill my prior contracts with private firms, and I will be liable to the government for damages only, and not to prosecution, or to have my plant taken by the government, and I prefer to break my contract with the government of the United States, and answer to it in damages for a breach of my contract made with it, rather than violate my contracts with my other customers and respond in damages to them.

I do not think, in order to bring itself within the protection and obligations of the acts of Congress, it was necessary for the plaintiff, under the circumstances stated, to hold back in answering to the wants and requirements of the United States, expressed through the Council of National Defense and Mr. Cromwell, acting as he was for the Paymaster of the Navy, until a formal order and direction was issued by the War and Navy Departments expressly commanding it to furnish the goods required. Nor do I think it was necessary for such an imperative command or order in that form ever to have been issued.

Through these committees, authorized by the acts of Congress referred to and duly appointed and set in motion by the departments of the government, and Mr. Cromwell, acting for the Paymaster, Mr. Hancock, as to the navy orders, this plaintiff and most or all of the manufacturers of such goods in the vicinity of Cohoes were advised of the wants and requirements of the Army and Navy Departments, and such manufacturers held meetings, considered the matter, and construed such letters received by them as an imperative requirement or command on the part of the government, and appointed a committee to confer with the representative of such Council of Defense and Mr. Cromwell authorized by the government to act in the premises, and did so confer, and were told by Mr. Cromwell the requirement was absolute. They were not advised of any option or choice on their part to meet or not meet the requirements of the United States. Terms were agreed upon, fixing prices and quantities and deliveries, and reduced to writing in the form of contracts. There was no suggestion that to constitute placing an order it was necessary to express in the contract that it was an order placed under the acts of Congress referred to. No formal form of order was drawn or put in use until later; and that form is used now only when it is deemed necessary to impress on the manufacturers the fact that the government has exercised its commandeer power. The plaintiff acted in perfect good faith. It was not a money-making scheme, nor did a desire for a better and a more remunerative contract actuate it. It was its purpose to answer to the call and demand of the government. It understood it was doing this.

If, after entering into these agreements, respectively, the plaintiff had refused to perform, I think it would have become liable to the United States, not only for damages, but to the pains and penalties of the act, and that the government lawfully could have and probably would have taken summary possession of its plant or factory, and would have been justified in so doing. The plaintiff would have been liable to a criminal prosecution and a charge of disloyalty.

The correspondence in evidence and the testimony of Paymaster

Hancock shows that the plaintiff and the other manufacturers referred to were acting with and pursuant to the direction of these committees or councils appointed by the United States authorities and those of Mr. Cromwell, also acting for the Paymaster of the Navy. The fact that an agreement as to quantities to be furnished and when, and price to be paid by the United States and when, was arrived at and writings made accordingly, cannot change the real and essential nature and character of the transactions. The question is: Was "an order placed" with the plaintiff for the clothing mentioned? What is meant by "placing an order"? and what must be done to constitute the "placing of an order," within the meaning of this statute? are questions to be settled. I know of no judicial interpretation of these statutes in the respects referred to.

The Council of National Defense was charged with the duty of "giving of information to producers and manufacturers as to the class of supplies needed by the military and other services of the government, the requirements relating thereto, and the creation of relations which will render possible in time of need the immediate concentration and utilization of the resources of the nation." In doing all he did do, and in writing all he did write, and making the statements he did make, Mr. Cromwell was acting within the scope of his apparent authority and under the act in question, and as to Navy orders for Mr. Hancock, Paymaster of the Navy Department. The plaintiff had the right to rely on all he said and did, so far as this record shows. I think the plaintiff had the right to believe and act on the assumption that Cromwell and Frey were representing the Secretary of War and the Secretary of the Navy, and that they were engaged in placing or causing to be placed an order or orders for the government, and not simply making or negotiating for an ordinary contract. It is proved that in fact Cromwell did represent the Navy Department. The officers of the army and navy acting in the matter repudiated nothing that was said or done or written, but, accepting the recommendation made in each case, had a formal agreement prepared and executed and delivered, fixing amounts, prices, and times of delivery, and I think and hold that under all the circumstances these acts and communications amounted to "the placing of orders" for these goods with the plaintiff corporation, and which goods were of the kind usually produced and capable of being produced by the plaintiff.

On April 6, 1917, a state of war was actually declared and from then on actually existed. Measures were being taken to create, arm, equip, and clothe an immense army and navy, and the United States, through its representatives, was making known the emergency demands for clothing and was asking these manufacturers what they could do and they were answering. May 22d Mr. Frey, representing the Advisory Board of National Defense, wrote:

"I would request you not to write me that you are sold up and cannot furnish any of these goods. I am aware that this condition prevails with every one. * * * It is not the committee's intention to place the whole burden on any one mill, but to divide it [the burden] according to production, and I would therefore request you to give this your prompt attention, and advise me promptly how much of this it will be your pleasure to take and at what price."

Was this a polite request to the plaintiff to negotiate and enter into a voluntary contract, or, rather, was it a polite statement and order that the fact plaintiff was "sold up" would be no excuse, and that "the burden" was to be apportioned and must be borne, "sold up" or not, and that each manufacturer would be and was required to supply his proportional share? Suppose the plaintiff had written, saying, "We are sold up; we must fill our commercial contracts and can manufacture nothing for the government"—what would have been the answer and consequences? A most emphatic and peremptory order, surely. And what burden was to be borne by entering into and undertaking the performance of a voluntary contract with the United States government? Was it not the burden of failing to perform contracts with its regular customers, with whom it had contracted? And Cromwell himself wrote:

"This underwear can be made by only a limited number of mills in the country. We have carefully apportioned it among the different mills, and know that we cannot secure the quantity needed unless we can receive from you 25,000 shirts and 25,000 drawers by October 1st, and the same quantity additional by December 1st."

Was not this an order from Mr. Cromwell, representing the Paymaster of the Navy? It was well known that Cromwell was a member of the Advisory Commission to the Council of National Defense, and he was in communication with the Council of National Defense during all these transactions, and with the Paymaster of the Navy Department. Orders given or placed by them were to take precedence in execution over contracts with private individuals and corporations, and it cannot be doubted that Frey, Cromwell, and the War and Navy Departments expected and understood that these orders given or contracts entered into were to be given precedence in execution over the other contracts which the plaintiff had theretofore entered into with private individuals, firms, or corporations. The Council of National Defense and the Advisory Commission were not created solely to negotiate and make contracts in the ordinary way, but to go beyond that and exercise greater powers in time of war or when war was imminent.

I am not to be understood as suggesting or holding that either Frey or Cromwell, acting alone, had power to place an order effective or binding on the United States; but they, especially Cromwell, were the means of communication between the plaintiff and the government, and what they said, did, and wrote is to be considered in determining the real character of the transaction, and what really was done. In view of all that was done, did the government have the right to treat these as orders within the acts of Congress referred to (National Defense Act and Navy Appropriation Act), and enforce them accordingly? Congress enacted the National Defense Act referred to, in contemplation of possible war, and later, as stated, war was actually declared between the United States and the Imperial German Government. The laws referred to were widely published and became generally known. In fact, manufacturers and those with whom they had contracted before said laws were enacted, or with whom they con-

tracted thereafter, are presumed to have known the law as it existed when contracts were made, and to have contracted with reference thereto. I do not doubt that Congress had power to place these burdens on the manufacturers, and on those with whom they had contracted or with whom they should contract. The war power is paramount, arises from necessity, and no government can endure without its exercise on occasion.

It may be and is argued that the plaintiff should have informed the government of its outstanding contracts with and obligations to third parties, but the government agencies started off by saying that they did not want the plaintiff to write they were "sold up"; that is, had prior contracts with third parties which it was its duty to fill before it could do anything for the government. This communication was a plain intimation such an excuse would not be accepted. Later Mr. Cromwell, he having ascertained the producing capacity of the plaintiff's mill and that of the other mills at Cohoes, and in fact of all the knit goods mills in the country, wrote that the amount or amounts of products from such mills had been carefully apportioned, and that certain quantities had been apportioned to the plaintiff as its share or portion. Nothing could be said in reply to this, unless it was to protest and plead prior contracts with outside parties; but this in substance and effect had been forbidden as an excuse in the very beginning. As stated, I cannot doubt that if thereafter, and before the execution of a formal agreement, the plaintiff had refused or declined to undertake the performance of this government requirement, especially the navy requirement, it would have been told that by what had been said and done orders within the meaning of the acts of Congress in question had been placed, and that such orders so placed must be complied with. I do not think it was necessary for the plaintiff to put itself in a position of seeming unwillingness to aid the government, or of being recalcitrant. Nor do I think it was necessary for the government to say:

"This is a command, which must be obeyed, and given under the National Defense Act and Navy Appropriation Act."

If the United States, in time of actual war with other nations and in an emergency, as was the case here, needs and desires the product of the mill or factory of a manufacturer, and of all the mills and factories in the country producing that class or kind of goods, and which are mentioned in the acts of Congress above mentioned, and seeks such manufacturers of such goods, makes its wants and requirements known, ascertains prices and quantities that can be produced and delivered, and then states that it will take such and such quantities at the prices named, to be delivered at times specified, and accompanies this by statements that it does not want an answer that the manufacturer is "sold up"—that is, already has accepted orders for all such manufacturer can produce—and that it has carefully apportioned its requirements amongst all the mills and factories capable of producing that kind of goods, and then requires and enters into a written agreement fixing quantities, prices, and deliveries, has it not, within the meaning and intent of the acts of Congress, "placed an order," the execution of

which by the manufacturer is obligatory, and has precedence over the other contracts of such manufacturer with private citizens and firms?

[5] It is urged that a person or a firm may not be commandeered under the acts in question to furnish knit goods underclothing for the men of the navy; that such articles are not "war material," as defined in the act of March 4, 1917, referred to. That act provides:

"The words 'war material' shall include arms, armament, ammunition, stores, supplies, and equipment for ships and airplanes, and everything required for or in connection with the production thereof."

The United States clothes its soldiers and men of the navy, furnishing underclothing, and I think the stores, supplies, and equipment for a ship include the clothing for the men who man the ships. To be of service the ships must be manned and the men must be clothed, and to be available and of use the clothing must be carried on board the ship as stores and supplies. I think food for the men, as well as clothing, forms a part of the ship's stores and supplies. The Paymaster of the Navy so testifies.

My attention is called to a certain form for commandeering, now in evidence, and which seems to have been adopted and put in use late in July, 1917, and since the transactions in question. But, even if this form of placing an order had been in use at that time, it does not prove that an order obligatory on the manufacturer could not have been placed in other ways, or that orders placed in other ways were mere contracts, not within the acts of Congress. Paymaster Hancock says orders are placed in both modes. The question still is: Were orders obligatory on the plaintiff, within the meaning of the law, placed? If so, and compliance therewith demanded the full output of plaintiff's mill or factory, performance of the contract with defendant was postponed to await compliance with the government order; that is, the government order took precedence. So far as these navy orders are concerned, it is plain that Mr. Cromwell was representing the Paymaster in charge of purchases.

If A., desiring to purchase for family use a bill of groceries required by him, goes to the groceryman, and, ascertaining prices for merchandise to be paid for on delivery and that delivery is or will be made on request, says, Please send to my house the following articles, naming them, required by me; and the merchant says, I will do so, has not A. placed an order therefor and one obligatory on the merchant, assuming it to be the duty of the merchant to fill orders when given? Would it change the nature or character of the transaction that the parties then made and signed a written memorandum of what had occurred? In such case, as here, there would be a valid contract; but can it be said an order was not placed, within the ordinary meaning of the words "place an order"?

The parties may come before me at some convenient time to settle findings of fact, and at such time the defendant can offer proof of its alleged damages, when I will rule on the question whether proof thereof should be taken. If proof thereof is now taken, and a finding made as to the amount thereof in case the Circuit Court of Appeals, on appeal, should reverse, and hold the defendant entitled to counterclaim

and offset its damages, and have an affirmative judgment in case such damages exceed the sum plaintiff is entitled to recover for goods delivered and not paid for, a final judgment could be pronounced, without the expense and delay of a retrial. The further proceedings in this court can be determined on a settlement of findings. If the parties do not otherwise agree, I fix the 6th day of July, at 11 a. m., at Norwich, N. Y., as the time and place for such hearing and settlement of findings.

