## L. N. JACKSON & CO., Inc. v. ROYAL NORWEGIAN GOVERNMENT.
### No. 30, Docket 21391.

United States Court of Appeals
Second Circuit.

Argued Oct. 7, 1949.

Decided Nov. 10, 1949.

Wharton Poor, of New York City (Haight, Deming, Gardner, Poor & Havens and James McKown, Jr., all of New York City, on the brief), for defendant-appellant.

Copal Mintz, of New York City, for plaintiff-appellee.

Before L. HAND, Chief Judge, and SWAN and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This is an action for breach of a contract for the carriage of goods by sea, entered into on November 7, 1941. Federal jurisdiction rests upon the diverse citizenship

of the parties. The defense for the conceded failure to transport the goods was based upon a contrary direction of the United States Maritime Commission. A further defense, added by permission of the court after the parties were at issue, was that of res judicata based upon a state court judgment exonerating the defendant's berth agent from liability to the plaintiff on this contract. After a trial to the court below, Judge Goddard rejected both defenses in an opinion reported in 83 F.Supp. 486, and gave judgment for the plaintiff for its loss of profits, together with interest and costs, in the total sum of $91,381.51. This appeal followed.

Although the action was brought against the Royal Norwegian Government's Director of Shipping, Oivind Lorentzen, the defense was assumed by the Government itself, which, during the period in question, operated and managed the Norwegian steamship "Tropic Star." This it had earlier requisitioned from the ship's owners. In November, 1941, the vessel was undergoing repairs at Durban, East Africa. The Seas Shipping Co., Inc., an American company, was acting as berth agent to book cargo for the vessel on its expected voyage from Beira, East Africa. On November 7, 1941, the berth agent sent a letter to plaintiff's agent acknowledging a letter of the previous day and confirming "that we have booked 1,000 tons Copra, in bags, for the SS 'Tropic Star,' expected to be ready to load at Beira on November 25th, destination New York, rate $22.00 per 2240#, brokerage 1¼%." This somewhat informal document—reproduced in full at 83 F.Supp. 488—is the contract here sued upon. It contained two further paragraphs, one that the agent was cabling its agents at Beira to arrange with the vendors for the delivery of the copra to the steamer and the other that it was understood that "the freight is collect and will be paid by your principals, Messrs. L. N. Jackson & Co., Inc., upon cable advice that the cargo has been loaded." And it showed that copies were going forward to "Mr. A. E. King, Asst. Director, Emergency Shipping, Maritime Commission, Washington, D. C.," as well as to representatives of defendant.

At this time there was in operation the system of ship warrants operated by the Maritime Commission pursuant to the Presidential Order of August 26, 1941, Executive Order 8871, 3 CFR, Cum.Supp., implementing the Ship Warrants Act of July 14, 1941, 55 Stat. 591, 50 U.S.C.A.Appendix, § 1281 et seq. This Act provided that the Maritime Commission might issue to American ships, and to such foreign ships as applied therefor, warrants entitling those ships to priority over merchant vessels not holding such warrants with respect to the use of facilities for loading, discharging, lighterage or storage of cargoes, the procurement of bunker fuel or coal, and the towing, overhauling, drydocking, or repair of such vessels. As a condition of these warrants, shipowners were required to file an undertaking accepting the orders of the Maritime Commission with respect to the trades in which a vessel might be employed, the voyages it should undertake, the class or classes of cargo or passengers to be carried, the fair and reasonable maximum rate of charter hire or equivalent, and such other matters as seemed necessary or expedient to the Maritime Commission. Disobedience of any order issued under the Ship Warrants Act entailed a fine of up to $5,000 or two years' imprisonment or both.

On October 4, 1941, more than one month previous to the booking in question, the Royal Norwegian Government had filed an application with the Maritime Commission for all of its ships which would or might come to United States ports. Although the actual warrants for the individual ships were not requested or issued until the ships were about to come within American jurisdiction, yet the trial court found defendant's intent to submit to the ship warrants system complete from the time of this application.

Due to war conditions the repairs to the steamer took longer than had been anticipated. The plaintiff was notified of the delays and continued to extend the time for loading at Beira. Meanwhile, on December 7, occurred the attack on Pearl Harbor and the precipitation of the United States into World War II. The combination of the delay in the repairs to the ship and these

world events led to a re-evaluation of shipping conditions, and that, in turn, to the dislocation of this particular transshipment. On December 22, 1941, Mr. A. E. King, Assistant Director of the Division of Emergency Shipping of the United States Maritime Commission, telephoned Mr. S. J. Maddock, vice-president of Seas Shipping Co., Inc., that the 1,000 tons of copra, booked for the "Tropic Star," would have to be cancelled and wool substituted. Maddock objected vigorously; but King was firm that the copra could not be moved, and later that day King sent Seas Shipping a confirmatory telegram to the same effect. Immediately upon receiving King's telegram ordering cancellation of the shipment of copra, Seas Shipping notified plaintiff's brokers by telephone, and wrote them a letter formally cancelling the booking. The shipper apparently tried unsuccessfully to have King rescind his order; and Seas Shipping, on December 31, 1941, sent King a telegram with the same purpose, but received a reply on January 2, 1942, reiterating King's previous orders.[1] In consequence the "Tropic Star" transported the wool, instead of the copra; and the plaintiff, not obtaining other shipping accommodations, has made claim for its loss.

The plaintiff first sued Seas Shipping Co., Inc., as the contracting party in the New York state court. The case was tried by Justice Irving L. Levey, sitting without a jury, in March, 1945; and his opinion dismissing the suit is reported as L. N. Jackson & Co. v. Seas Shipping Co., 185 Misc. 94, 56 N.Y.S.2d 501. Dismissal was on two grounds: (1) that the direct intervention of a governmental mandate worked such a frustration of the contract as to excuse without question nonperformance by the defendant; and (2) that Seas Shipping was the agent of a disclosed principal, and not therefore liable to the plaintiff. The judgment was affirmed by the Appellate Division, 270 App.Div. 830, 61 N.Y.S.2d 371, and by the Court of Appeals, 296 N.Y. 529, 68 N.E.2d 605, without written opinion in either court. Then plaintiff sought a re-

hearing because of the decision just rendered by this court in Baker Castor Oil Co. v. Insurance Co. of North America, 2 Cir., 157 F.2d 3, certiorari denied 329 U.S. 800, 67 S.Ct. 494, 91 L.Ed. 684 (also relied on by the plaintiff and by the court below in this action); but the motion for reargument was denied without opinion. 296 N.Y. 635, 69 N.E.2d 483.

Thereafter plaintiff instituted this action and obtained the judgment from which this appeal is taken. Defendant here, as below, relies on the defenses that the order of the Maritime Commission cancelling the booking of copra excused performance, or alternatively that the findings, conclusions, and judgment of the New York Supreme Court, to the effect that the telegram from the Maritime Commission requiring the cancellation of the copra booking was a complete legal excuse for the noncarriage of that copra, are res judicata here. In rejecting these arguments, the district court awarded plaintiff damages based upon the difference between the sale price of the copra in East Africa, plus transportation charges, and its market value in New York in February, when the vessel should have arrived after a normal voyage. This was $64.19 a ton. Hence the shipper's loss of profits was $64,190, which, together with interest and costs, made up the total judgment of $91,381.51. On this appeal we shall direct our attention to the first contention.

With every succeeding war in which this nation has engaged, the impact of conflict upon the civilian populace has been more demanding and more complex. The "total war" now affecting all citizens, even upon what is now significantly termed the "home front," is quite different from the far distant battles of the Army and Navy in the Spanish American War, or even the substantially greater effort at war production of the First World War. Now it has become a recognized function of government to regulate industry, business, and even the personal lives of all to advance the war effort; and necessarily courts must interpret, supervise, and enforce these controls. True,

1. King's telegrams and Seas Shipping Co.'s letter to the shipper are set forth in 83 F.Supp. 488, 489; and see also 185 Misc. 94, 56 N.Y.S.2d 501, 503.

actual war had not come in the summer and fall of 1941, though we were steadily limping along toward preparedness, as the legislation discussed in this case shows. It was of course the attack on Pearl Harbor which finally startled all into a realization of the need of governmental directives toward a common goal. After that, and with the onset of the submarine war, uncontrolled shipping was unthinkable. Of such revolutionary events the law must take note; indeed, there is high authority for the view that the precedents from former wars are inadequate guides for the mammoth conflicts of the present era. Writing in prophetic strain in the lee of World War I, Professor Dodd had urged that "courts are free to regard the problems arising out of governmental interference in wartime as to a large degree sui generis, and that they need not adhere strictly in cases of this sort to the precedents which have been established in the law of impossibility of performance in general, but are at liberty to reach the results most consistent with justice and public policy, as long as these results can be attained with due regard to the more fundamental principles of the law of contracts." Dodd, Impossibility of Performance of Contracts Due to War-Time Regulations, 32 Harv.L.Rev. 789, 791. So Judge Rose expressed similar views, The Isle of Mull, D.C.Md., 257 F. 798, 809, though, ironically, his decision was reversed for more complete exoneration of the promisor in 4 Cir., 278 F. 131, certiorari denied 257 U.S. 662, 42 S.Ct. 270, 66 L.Ed. 423. An ultimate conclusion may well be the legislation which was passed during the recent crisis and which is urged to be widely applicable. Pedrick and Springfield, War Measures and Contract Liability, 20 Tex. L.Rev. 710; Frey, Contract Defaults and Cancellations in Wartime, 38 Ill.L.Rev. 167, 169.

But all this seems in truth more the application of older principles to the new circumstances than a definite change or reversal of precedent. For it is well settled that a contractual duty is discharged, in the absence of circumstances showing either a contrary intention or contributing fault on the part of the person subject to the duty, where performance is subsequently prohibited by an administrative order made with due authority by an officer of the United States. Restatement, Contracts § 458(b), 1932; Williston on Contracts §§ 1938, 1939, Rev.Ed.1938. And this, in turn, is but the analogue of the situation where performance cannot be had because of the destruction of the subject matter or the death of the promisor or like cause. Restatement, Contracts §§ 457, 459. A pat example is found in the law of shipping itself, where the loss of the ship, before the time of voyage, dissolves the contract of carriage. Texas Co. v. Hogarth Shipping Corp., 256 U.S. 619, 630, 631, 41 S.Ct. 612, 65 L.Ed. 1123; The Tornado, 108 U.S. 342, 349-351, 2 S.Ct. 746, 27 L.Ed. 747. Here the parties, the court below, and the state court have framed the issue in terms of the "frustration" of a contract; but that, as Professor Corbin has said, may be "only perpetuating the use of a bad term to state the result." Corbin, Frustration of Contract in the United States of America, 29 J.Comp.Leg. & Int.L., Pts. III and IV, pp. 1, 7. It is more than the situation where the objectives of a contract are no longer possible of achievement, for the performance itself has become impossible. See also McElroy, Impossibility of Performance 130, 131, 169 et seq., 194, 1941. And since the parties may have stipulated as to, or at least had in mind, the very occurrence, the issue becomes one as to the fairness and justice of excusing performance in the light of the circumstances affecting the parties at the time they made their contract.

In fact that is the very issue to which the state court and the district court addressed themselves, though they reached opposing results. We agree that this is the sole issue on this branch of the case, notwithstanding the vigorous arguments of the plaintiff that supervening impossibility of performance was not shown. To us the overriding power of the American government seems so clear that the plaintiff's stress on this point suggests some sense of weakness on the main issue. Neither court was impressed by the claim that the governmental mandate here was not a real one; nor are we. Plaintiff's argument that Mr. King did not

have the authority vested in the Maritime Commission is belied by the proof as to the duties he performed, the showing of the nature of his formal appointment, and the explicit testimony of his superior officer; the findings of his authority are more than justified. The same is true as to the findings that defendant intended to submit itself to the Ship Warrants system from October 5, 1941, on, notwithstanding that a warrant was not actually issued to this vessel, and in fact was not needed by it until it came later into American waters.

Finally the assertion that defendant, as a sovereign power, was not bound to obey the commands of an ally overlooks the realities of defendant's position, as well as the terms of its own commitment. This was a year and a half after the German invasion of Norway. Defendant was then a government in exile. Neither then nor later did it give sign of lack of loyalty to the allied cause; and it was one of the twenty-six countries which on January 2, 1942, subscribed to the "Declaration by the United Nations," as a pledge to pursue a common purpose against a common foe and to cooperate with each other in their common struggle. It was not likely, therefore, that it would join with the three countries of known Fascist sympathies—Argentina, Portugal, Spain—against the vast body of the world's neutral merchant marine, in refusing to accept the Ship Warrants system. Had it done so, the President's power to requisition foreign merchant vessels in American waters had already been granted by the Act of June 6, 1941, c. 174, 55 Stat. 242, 50 U.S.C.A.Appendix, § 1271, and was

available for as effective use here as was its operation against, for example, the Danish vessels. Actually no question of that kind arose, for defendant clearly intended to accept the burdens of the Ship Warrants system and to carry out its obligations under it. The testimony by defendant's representatives, to the general purport that no dispute of power had occurred or would occur, bore this out rather than the contrary as plaintiff would have us believe. There is not the slightest doubt that Congress, in authorizing this system, intended it to have coercive effect; indeed this is stated by no means indirectly.[2] In fact, much less show of immediate and direct coercion would, it seems, have been adequate in law as a showing of impossibility by governmental command. Moore & Tierney, Inc., v. Roxford Knitting Co., D.C. N.D.N.Y., 250 F. 278, affirmed 2 Cir., 265 F. 177, 11 A.L.R. 1415, certiorari denied 253 U.S. 498, 40 S.Ct. 588, 64 L.Ed. 1032; Hulton & Co. v. Chadwick & Taylor, 34 T.L.R. 230; Dodd, supra at 767. And the reality of the coercion upon the defendant to carry the wool, instead of the copra, is not subject to doubt upon this record.

Hence we shall turn to the controlling question whether the defendant's promise was so without exception in law that, notwithstanding the governmental coercion, it must pay the plaintiff's lost profits on the transaction. In approaching this question the court below quoted in substance from an annotator in 157 A.L.R. 1446 in stating that the "doctrine of commercial frustration" is directed to affording relief "where the parties could not provide themselves by the

2. Thus the stated purpose of the Ship Warrants Act was to plan the operation of the merchant fleet "in such manner as will make their cargo space immediately effective in accomplishing our objective of all-out aid to the democracies." H.R.Rep.No.526, 77th Cong., 1st Sess., 2, 1941; Sen.Rep.No.484, 77th Cong., 1st Sess., 2, 1941. And Rep. Dirksen, in reporting this bill in the House, said: "There is an ancient technique in this bill. It does not say that a vessel owner must go and get a warrant. The same technique is employed that we employed in the farm legislation. * * * This is what we say in

this bill. No man must go and get a warrant for his vessel, but if he does not get a warrant, it means that he is foreclosed so far as certain facilities are concerned, so far as docks and wharves and fuel and loading facilities are concerned. So there is the indirect pressure by which vessel owners and operators must go and get themselves a warrant from the Maritime Commission." 87 Cong.Rec. 4288, May 20, 1941. Sen. Bailey, chairman of the Senate Committee on Commerce, spoke to similar effect in reporting the bill to the Senate. Id. at 5660, June 28, 1941.

terms of the contract against the happening of subsequent events, but it does not apply where the intervening event was reasonably foreseeable and could and should have been controlled by provisions of such contract." 83 F.Supp. at page 490. It carries forward this idea by asserting that this defendant, after making its "contract with the United States Government under the conditions of the Ship Warrants Act" then "knew or should have known that its future contracts for carriage were subject to the conditions and potential limitations" of that act and under such circumstances "cannot claim that the orders of the Maritime Commission were not foreseeable." And finally the act of the Maritime Commission "was not an exercise of vis major, but merely the exercise of a contractual right granted to it by the defendant." Id., 83 F.Supp. at pages 490, 491. This approach practically puts the burden upon the promisor to show non-foreseeability. Carried to its logical limits such a view would practically destroy the doctrine of supervening impossibility, notwithstanding its present wide and apparently growing popularity. Certainly the death of a promisor, the burning of a ship, the requisitioning of a merchant marine on the outbreak of a war could, and perhaps should, be foreseen. In fact, the more common expression of the rule appears to be in terms which tend to state the burden the other way, e. g., that "the duty of the promisor is discharged, unless a contrary intention has been manifested" or "in the absence of circumstances showing either a contrary intention or contributing fault on the part of the person subject to the duty." Restatement, Contracts §§ 457, 458; 6 Williston on Contracts § 1953, pp. 5475, 5476, Rev.Ed. 1938; Pedrick and Springfield, supra at 735; Texas Co. v. Hogarth Shipping Corp., supra; The Kronprinzessin Cecile, 244 U.S. 12, 22, 24, 37 S.Ct. 490, 61 L.Ed. 960; W. J. Tatem, Limited v. Gamboa, [1939] 1 K.B. 132, 137, 138, citing Viscount Haldane in F. A. Tamplin Co. v. Anglo-Mexican Co., [1916] 2 A.C. 397, 406; Bank Line Ld. v. Arthur Capel & Co., [1919] A.C. 435; Joseph Constantine Steamship Line, Ltd. v. Imperial Smelting Corp., Ltd., [1941] 2 All Eng.R. 165; McNair, Frustration of Contract by War, 56 L.Q.Rev. 173, 178.

 Whether or not these authorities go so far as to state a definitive rule of preferred interpretation, they do certainly suggest that, where the external circumstances present a case for the fair operation of a rule excusing performance, that shall not be denied unless the fault in not providing against it seems clear and unilateral. We think the court below placed too heavy a burden upon the defendant and that fairness and justice require the acceptance of the excuse as being both compelling and beyond the terms of the defendant's obligation, properly considered. Several circumstances lead to this conclusion. Among those, we may note the general knowledge and means of knowledge of all those having to deal with American shipping at the time, the informal and incomplete form of the "booking" agreement itself, the drastic and unexpected nature of the crisis following upon Pearl Harbor, the view of the courts generally and of the courts of the forum, New York, in particular in excusing performance in like situations, and the attitude of Congress in enacting protective legislation for the relief of contracting parties caught by the enforcement of government priorities. We now consider these matters in more detail.

On the first point, it seems to have been assumed that only the defendant had knowledge of the shipping conditions prevailing under the Ship Warrants system on November 7, 1941. This passes belief. It is to be noted that plaintiff presented no evidence on this point at all, its entire case being limited to the documents showing the agreement and its cancellation. These disclose that each of the parties acted through an American shipping agent. That the agent acting for plaintiff had so little knowledge of his business that he did not know the then most important development in it, that, indeed, he had no suspicion even when the crucial letter showed on its face that it was going forward to the governmental agent in actual control of American shipping, is not easy to accept. Were such to be the fact,

it would mean that he knew no more than to ship by a vessel for which there was no assurance of its ever docking and unloading in contrast to the more favored carriers who either were of necessity under the system or had accepted it. At most this seems to us clearly a case within the authorities that plaintiff should have known of the existence and operation of the system substantially as fully as the defendant, that defendant could reasonably have so concluded, and hence that there was no arbitrary obligation on the defendant to protect itself by express stipulation against the operation of the system. This is borne out by the nature of the contract itself, which is in form a reservation of space for the goods in this vessel for the voyage. Obviously it does not assume to set forth the detailed obligations of the parties. No obligation at all is stated for the shipper, except to pay the freight upon the cabled advice that the cargo has been loaded. On the carrier's side, it may be noted that no attempt is made to state even the standard condition, referred to above, that the vessel shall not have been destroyed before the start of the voyage.

Next we have the nature of the governmental crisis which was the direct cause of the mandate here. After all, we need not consider what would have been the legal effect of a direction from the Maritime Commission for the substitution of a cargo in the place of the one contracted for had it been given before December 7. That did not happen. It is clear that the Maritime Commission, which originally suggested the availability of the "Tropic Star" to Seas Shipping for this voyage, expected the arrangement to be carried out, as did all the other parties at the time it was initiated. Actually it was the Pearl Harbor calamity, the resulting wars over the world, and the immediate shipping crisis which furnished the real occasion for the chain of events precipitating this case. To say that this, the greatest naval disaster in our history, was unexpected is of course an understatement. The contrast is pointed up by a case not cited below, Madeirense Do Brasil S/A v. Stulman-Emrick Lumber Co., 2 Cir., 147 F.2d 399, certiorari denied 325 U.S. 861,

65 S.Ct. 1201, 89 L.Ed. 1982, where a Brazilian carrier was held not excused from failing to deliver goods for lack of shipping because of war conditions in Europe known to it at the time. "There was no startling change in conditions. The war in Europe had been under way for more than a year, and Pearl Harbor was still in the future. Neither the United States nor any of the South American countries entered the war for a year or more after the making of the contract. Hence the lack of ships in January, 1941, was a foreseeable risk which plaintiff willingly took upon itself; and it cannot under such circumstances plead the defense of 'force majeure.'" Id., 147 F.2d at page 403.

Our conclusion seems to us thoroughly borne out by the more direct analogies in the precedents. Of the cases cited supra, the leading case of The Kronprinzessin Cecile, 244 U.S. 12, 24, 37 S.Ct. 490, 492, 61 L.Ed. 960, perhaps goes further, since there the contract of shipment, made July 27, 1914, when war was threatening, had actually been entered upon when on July 31, the master, then two-thirds of the way on his journey, turned back by direction of his owners. Here it was that Justice Holmes made his famous statement that the contract "embodied simply an ordinary bailment to a common carrier, subject to the implied exceptions which it would be extravagant to say were excluded because they were not written in. Business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs." See also Texas Co. v. Hogarth Shipping Corp., supra; Allanwilde Transport Corp. v. Vacuum Oil Co., 248 U.S. 377, 39 S.Ct. 147, 63 L.Ed. 312, 3 A.L.R. 15; The Claveresk, 2 Cir., 264 F. 276, affirming Earn Line S. S. Co. v. Sutherland S. S. Co., D.C.S.D.N.Y., 254 F. 126, per L. Hand, J.; Edward Maurer Co. v. Tubeless Tire Co., 6 Cir., 285 F. 713; New York Trust Co. v. S. E. C., 2 Cir., 131 F.2d 274, 276, certiorari denied 318 U.S. 786, 63 S.Ct. 981, 87 L.Ed. 1153; Patch v. Solar Corp., 7 Cir., 149 F.2d 558, 560, certiorari denied 326 U.S. 741, 66 S.Ct. 53, 90 L.Ed. 442. "The risk of such government action is not one that the owner has agreed to bear, even in the absence

of a force majeure clause; and it is not one that by common practice and opinion he should be required to bear." Corbin, supra at 7. See also McElroy, op. cit. supra at 37, 38; Dodd, supra at 804; Robinson on Admiralty 652-663, 1939. The case of Baker Castor Oil Co. v. Insurance Co. of North America, supra [157 F.2d 4], cited below, is not in point. There the plaintiff attempted to rely on a "restraint of princes" clause to recover on a policy of marine insurance for additional expense on a shipment from Brazil for rail transportation from New Orleans to New York occurring because the War Shipping Administration had directed the vessel to put in at that port during the submarine warfare, instead of proceeding directly to New York City. The court, however, found that this change in voyage was done to secure a policy of war risk insurance upon the hull, granted by the Administration only on condition that the deviation was had; it was therefore a matter of agreement, rather than of official governmental command.

Turning to New York, the law of the forum, we find perhaps even more insistence on exoneration of one who yields to the government's demands in wartime. In Mawhinney v. Millbrook Woolen Mills, 231 N.Y. 290, 299, 300, 132 N.E. 93, 96, 15 A.L.R. 1506, it was the seller's own doing that led the government to give him such large orders that he was forced to cancel his contracts to make civilian goods. In exonerating him for his nonperformance, the court aptly said: "The willingness and desire of a manufacturer to serve the government under such circumstances and conditions in preference to civilian trade cannot be presumed to be a mere desire to profiteer. But, whether it be or not, it is the government we must think of and its necessity for preservation; it needed equipment at once and this required that all else be laid aside irrespective of the motive of the manufacturer in complying. The one who gave his service with alacrity under such conditions should at least be considered with as much

favor as he who held back until threatened or his property commandeered. The laggard who feared the financial results under his civilian contracts merits no encouragement. The fact that the defendant may have sought or welcomed the government work is immaterial." A similar result was reached in Nitro Powder Co. v. Agency of Canadian Car & Foundry Co., 233 N.Y. 294, 135 N.E. 507. Finally we have the decision of this very issue in L. N. Jackson & Co. v. Seas Shipping Co., supra, where the trial justice placed his primary holding on this point; though the affirmances by the appellate courts were without opinion, it is at least apparent that these courts felt no compulsion to repudiate Justice Levey's direct and forceful decision on these facts.

Finally we turn to an important enunciation of public policy in situations of this sort as made by Congress in the Act of May 31, 1941, 55 Stat. 236, amending the prior Act of June 28, 1940, and now set forth in 50 U.S.C.A.Appendix, § 1152(a) (7). This act authorized the President to assign priorities on delivery of materials and then provided: "No person, firm, or corporation shall be held liable for damages or penalties for any default under any contract or order which shall result directly or indirectly from his compliance with any rule, regulation, or order issued under this section." (Later it was amended to add that this should be so, even though the rule, regulation, or order should thereafter be declared invalid, Second War Powers Act, § 301, 56 Stat. 177.) Since the Commission's order was a step to carry out the priority requirements as established by the Office of Production Management, there is ground for asserting that this statute is directly applicable to the circumstances of this case. Pedrick and Springfield, supra at 719; cf. Nash v. Southern Pac. Co., D.C.N.D.Cal., 260 F. 280, 284. But we need not go that far here in view of the basis we find in the common law for our conclusion. At the very least the Act, particularly against the background of its legislative history,[3] is am-

3. "There is another serious disadvantage in these voluntary preferences: the manufacturer who recognizes them and gives priority to deliveries under them, runs the risk of damage suits by any and all private customers if the deliveries to such private customers under contracts and orders already placed are

ple demonstration of the legislative view that persons co-operating with the war effort should not be held liable for civil damages because of their acts. Frey, supra at 169. It thus re-enforces and supports the common-law principle.

In rejecting the defense of res judicata based upon the state court judgment, the district court pointed out the separate grounds for decision stated by the trial justice and held that the affirmance of this judgment, without opinion, by the state appellate courts was not an adoption of the reasoning or legal conclusions of the trial court, but merely an approval of the result. In view of our conclusion upon the other branch of this case, decision upon this issue is unnecessary. We hold that the defense is sustained and the action must fail.

Reversed and remanded for dismissal of the action.

L. HAND, Circuit Judge (dissenting).

If the plaintiff had known, when the contract was made, that the defendant had already consented to take out warrants under the Act, I should agree that the case fell within the well-settled doctrine of the Kronprinzessin Cecile;* because, although the defendant was not absolutely prevented from lifting the copra, the reprisals to which it would have subjected itself, if it did, were so serious that they would have excused performance. The basis of such an excuse is stated in the opinion of Holmes, J., in the case I have just cited: performance is excused, when "it cannot be believed that the contractee would have demanded or the contractor would have assumed" the risks which it entails. The course of the law away from an unyielding adherence to the literal meaning of the words, is no different in the case of contracts from its course in other legal transactions. As courts become increasingly sure of themselves, interpretation more and more involves an imaginative projection of the expressed purpose upon situations arising later, for which the parties did not provide and which they did not have in mind. Out of the rivers of ink that have been spilled upon that subject I know nothing that has emerged which enlightens us beyond the caution that departure from the text—necessary as it is—must always be made with circumspection.

It is an obvious corollary of such a canon of interpretation that the risks which the promisor would have insisted that he should not be obliged to accept, and which the promisee would have agreed that he need not, must be the same. And it follows that, when the promisor offers as an excuse a burden upon his performance which he did not provide against, he must be content to have the question decided by the facts that both he and the promisee knew in common when the contract was made. For instance, although a promise to perform personal service is excusable by the death of the promisor, it would not be so, if the promisor knew that his death was imminent. For this reason in the case at bar the defend-

---

postponed by the recognition of such voluntary preference ratings. To suggest that the manufacturer can protect himself by obtaining the consent of each private customer is an inadequate answer, since such private customers may, within their rights, refuse to grant such consent. * * * Thus, the issuance of such voluntary preference ratings places an unfair burden upon the manufacturer who is expected to recognize them. Each manufacturer may be putting his head in a noose which may not draw tight until 6 years hence when sued for damages at the expiration of the period of the statute of limitations." H.R. Rep.No.460, 77th Cong., 1st Sess., 4, 1941. "It is important to give clear statutory protection to all manufacturers who comply with priority orders." Id. at 6. This report was also adopted by the Senate Committee on Naval Affairs, Sen.Rep.No.309, 77th Cong., 1st Sess., 1941. The debate in the House, 87 Cong.Rec. 3802, 3803, May 8, 1941, shows that the Committee rejected the idea of government recompense for losses thus incurred for the principle "that everything must stand aside for the national-defense program" and that "the individual must make sacrifices, everybody must make sacrifices." Per Rep. Vinson, chairman of the Committee on Naval Affairs.

* 244 U.S. 12, 37 S.Ct. 490, 491, 61 L.Ed. 960.

ant's excuse is to be judged as though it had not in fact consented to take out warrants for all its ships; and, while I agree that we cannot say affirmatively that our entrance into the war would not in that case have excused the defendant's performance, this record does not satisfy me that it would. True, the plaintiff did urge upon the Commission that a cancellation of its contract would involve it in loss, and the Commission was obdurate; but, the defendant was in a much weaker position to press such a claim because of its consent. Perhaps it would not have been successful had it not consented; but I do not see how we can say that a priori. After all, although it was at the time a feeble government in exile, it represented a friendly power and an ally, which by hypothesis had not yet agreed to pool its many ships; and surely it would have been highly desirable to us that it should do so voluntarily. I do not suggest that the Commission could not have forced it to comply, but I do suggest that it might have thought that less than one third the cargo space of the "Tropic Seas" was not a stake which would have justified coercive measures, while the defendant's consent still remained in abeyance; or indeed a stake which, all things considered, would have justified even a request to repudiate its contract with the plaintiff. Whether such a request unaccompanied by any intimation of coercion would have been an excuse is a question which I am not prepared to answer, and it is not necessary to do so, since my views are not to prevail.

Therefore, I think that the defendant had the burden of proving either (1) that the Commission would have coerced or at least would have requested the defendant to repudiate its contract; or (2) that the plaintiff would have engaged the space in the "Tropic Seas," even if it had known that the defendant had already consented to take out warrants for its ships. Strictly, we might therefore affirm the judgment because of this failure in the proof; but that I think would be scarcely just, for the trial was not conducted on any such theory. I would therefore reverse the judgment; but, instead of dismissing the complaint I would remand the cause for a new trial.